**FEDERAL TRADE COMMISSION, Plaintiff,**

**v.**

**KITCO OF NEVADA, INC., d/b/a Kitco, Inc., d/b/a Krown Manufacturing Co., Duane F. Snelling, a/k/a Harvey Butterfield, John E. Farkas, Craig A. Jesinoski, and Jason Barton, a/k/a Jay Barton, Defendants.**

**Civ. No. 4–83–467.**

United States District Court, D. Minnesota, Fourth Division.

June 7, 1985.

---

Karen L. Egbert and David M. Malone, F.T.C., Washington, D.C., for plaintiff.

Dennis J. Holisak, Minneapolis, Minn., for defendants Krown Mfg. Co. and John E. Farkas.

Duane Snelling, Las Vegas, Nev., pro se.

DIANA E. MURPHY, District Judge.

Plaintiff, the Federal Trade Commission (FTC), brought this action pursuant to section 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 53(b), against defendants Kitco of Nevada, Inc., d/b/a Kitco, Inc. (Kitco), d/b/a Krown Manufacturing Co. (Krown), Duane F. Snelling, a/k/a Harvey Butterfield, John E. Farkas, Craig A. Jesinoski, and Jason Barton, a/k/a Jay Barton. The FTC seeks a permanent injunction, rescission of contracts, and consumer restitution for defendants' alleged violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). Jurisdiction is based upon 28 U.S.C. §§ 1331(a), 1337(a) and 1345, as well as 15 U.S.C. §§ 45(a) and 53(b).

On June 10, 1983, the court issued a temporary restraining order (TRO) enjoining the defendants from misrepresenting various facts concerning business opportunities and freezing their assets. Later a preliminary injunction issued enjoining all of the defendants except Jesinoski and Barton from deception and fraud in violation of 15 U.S.C. § 45(a) and freezing their assets. The TRO issued against Jesinoski and Barton was dissolved at that time. Defendants John E. Farkas, and Krown, jointly, and Snelling, separately, filed answers denying the FTC's allegations. Defendant Jesinoski, although properly served, failed to plead or otherwise defend. The clerk entered a default on September 4, 1984. The FTC seeks default judgment enjoining Jesinoski from engaging in specific violations of 15 U.S.C. 45(a) and ordering him to make restitution to injured Kitco purchasers. At trial, the FTC moved for a dismissal without prejudice against defendant Jason Barton because it was unable to locate him for service of the summons and com-

plaint. The FTC also agreed to dismiss its claim against the corporate defendant Kitco because the defendants had abandoned it in mid-1983. Accordingly, evidence presented at the trial pertained mainly to defendants Farkas and Snelling.

Prior to trial, the court granted the FTC's request to strike the jury demand contained in the joint pleading of Krown and Farkas. 612 F.Supp. 1280. The court also denied Snelling's motion for a court-appointed lawyer and the FTC's motion *in limine* requesting that 18 consumer affidavits be admitted into evidence in the upcoming trial.

Trial to the court took four days. Defendant Snelling appeared on the third and fourth day, but presented no evidence on his own behalf. At the conclusion of the trial, the parties received additional time in which to brief three legal issues: 1) whether testimony of defendant Farkas should be striken from the record; 2) the admissibility of 20 sworn consumer affidavits by Kitco purchasers who did not appear as witnesses at trial; and 3) whether Kitco purchasers who initiated private law suits against either Kitco or the individual defendants are barred from restitution under Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b). Submissions were received from plaintiff and defendant Farkas.

The court has carefully considered the testimony of the witnesses and evaluated their credibility. It has also considered the depositions, answers to interrogatories, and exhibits presented at trial and all arguments and memoranda of counsel. The court enters this Memorandum Opinion and Order for Judgment as its findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

## I. FACTUAL BACKGROUND

Kitco began selling business opportunities for the manufacture of plastic specialty items in August 1981. Both of the individual defendants were associated with Kit-

co. Snelling held himself out as Kitco's president during the entire time it operated. Defendant Farkas claims that his role was limited to that of office manager.[1] The FTC contends, however, that Farkas was a principal who directed, controlled and/or formulated Kitco's business practices.

Beginning in August 1981, Kitco attracted prospective purchasers by placing advertisements in newspapers throughout the country stating "contract work provides nice income." FTC Ex. 1A. Testimony at trial indicated that both Snelling and Farkas placed these ads. Respondents to the ads either were contacted directly by a Kitco sales agent or received a form letter signed by Jesinoski on Kitco letterhead. The letter stated that Kitco offered a "time proven, effective, and workable" business opportunity in the manufacture of plastic products. FTC Ex. 17. The letter noted that Kitco would furnish "all the necessary contract and retail outlets, so that no selling is required by you whatsoever other than customer relations and business management." *Id.*

A number of sales agents were employed by Snelling to contact and arrange meetings with potential purchasers. One of these agents, Nancy Andrews, testified at trial. She stated that Snelling provided the agents with Kitco contracts and brochures entitled "Kitco—The Key to Your Future—Profit." *See* FTC Ex. 2, 26, 39. According to the consumers who testified, the sales agents would present these brochures to potential purchasers at their first meeting.

The brochure stated that the business could be started immediately and could produce immediate income. It also stated that the business was highly profitable. The brochure included a cost breakdown sheet which indicated that the "gross profit" for making one pair of 12″ by 24″ signs was $32.20. The brochure claimed that the machine could produce 40–50 pairs of magnetic signs per hour. *Id.* The brochure also contained a list of Kitco references, which included at times J & J Distributing, locat-

---

**1.** The issue of the admissibility of Farkas' testimony will be discussed *infra.*

ed at 1419 E. Lake Street and Formaster, located at the same address. *See* FTC Ex. 2, 18, and 48. J & J Distributing apparently never existed. Formaster was owned by Farkas. FTC Ex. 7.

Farkas has admitted that he helped Kitco do approximately $15,000 worth of this printing between August and October of 1981. John E. Farkas' Supplemental Answers to Plaintiff's Second Set of Interrogatories. Rather than loaning Snelling actual money, Farkas lent Snelling $15,000 worth of "barter credits"[2] which could be used for printing.

Each purchaser appearing at trial testified that the sales agents they dealt with stated that Kitco would provide ongoing contract work. Some were told that Kitco provided so much work that they could pay off the price of the business opportunity within one year. To bolster the claim of ongoing contract work, Snelling provided sales representative Andrews with orders Kitco received from J & J Distributing to produce 650,000 football signs and 300,000 religious plaques. FTC Ex. 9 and 10. Andrews was told to show these orders to prospective purchasers as examples of the type of work they would be doing for Kitco. The orders were signed by a "Harvey Butterfield." Snelling later admitted to Andrews that he was Harvey Butterfield.

Sales agents also represented that Kitco provided immediate payment for finished products and that investment in the business opportunity would be extremely profitable. Andrews was instructed by Snelling to tell prospective purchasers that they could earn $70,000 to $80,000 a year. Gross earnings claims ranged from $5,000/month, Hoch's testimony, to $170,-000/year, Jensen's testimony. Projected

profits ranged from $30,000 to $50,-000/year. Testimony of McGree.

The purchasers and Andrews testified that the sales agents frequently encouraged prospective buyers to contact Snelling and/or Farkas to verify the sales representations. Daniel Jensen testified that Snelling verified the sales brochures and told him that he would have no problem receiving work and contracts. Jensen also testified that he spoke with Farkas in November 1981 about the business opportunity before he bought it, and that Farkas verified that continuous work would be provided by Kitco.[3] June McKenzie, another Kitco purchaser, testified that Farkas personally represented that Kitco would provide ongoing work contracts and give them all the work they wanted. At a meeting around August 31, 1981, Farkas and Snelling convinced McKenzie and her husband, Richard, to void a contract they had signed with Distinctive Products, a company for which Farkas had been sales manager. Farkas urged the McKenzies to sign a new contract with Kitco because it was a better company. McKenzie further testified that Farkas appeared to be in charge and that he did most of the talking at the meeting. Similarly, Dale Davis testified that he met with Farkas when he came to Minneapolis to view the Kitco premises before investing in the business opportunity. Davis testified that Farkas confirmed everything that the sales agent had told him, including potential earnings and a guaranteed supply of work.

Evidence also shows that Farkas used his company Formaster to solicit purchasers for Kitco. Farkas states that he pressured Kitco to pay him for his barter credits, but that he received nothing until he

---

**2.** Farkas testified that he had contributed products from his past businesses to a barter company and had run up approximately $15,000 worth of credits. Under the system, he could use these credits to obtain products or services from other companies who were members, and he transferred these to Snelling.

**3.** Upon cross examination, counsel for Farkas asked Jensen to read that portion of the affidavit he gave to the FTC which pertained to Far-

kas. *See* Farkas Ex. 35. Jensen did not allege any specific details of misrepresentation in the affidavit but merely stated that he and Farkas "discussed the business opportunity." Jensen specifically stated at trial, however, that Farkas verified that continuous work would be provided and that all orders would come from Kitco. The court found his testimony to be credible and believable.

agreed to accept a used Vacu-Form machine in early 1982. With that machine he opened Formaster. Farkas claims that Formaster had no connection with Kitco other than to buy products from it. Several Kitco purchasers were given a brochure from Formaster, however, which was almost identical to the one used by Kitco sales agents. Compare FTC Ex. 19 and 23 with FTC Ex. 2 and 26. Additionally, a Kitco product brochure listed Kitco at the Formaster address. FTC Ex. 8.

In the fall of 1981, Steven Kocak answered an ad for a business opportunity with Distinctive Products. He received a Formaster brochure, however, and ultimately signed a contract with "Co-op Plastics". FTC Ex. 24. This contract is identical to the one used by Kitco, and the word Kitco appears several times. *See Id.* Co-op Plastics was listed at the same address as Formaster and Farkas told Kocak that each of these companies was a part of Kitco. Kocak delivered his finished products to Formaster. Farkas subsequently admitted to Kocak that he had personally received a good portion of the sale price of Kocak's business opportunity.

Similarly, Richard Hoch visited Formaster before deciding to purchase the business opportunity. Farkas told Hoch that Kitco had set him up in business, supplied him with contract work, and that the business was very successful.

The FTC claims that Kitco paid Farkas or Formaster for these services and the record shows that approximately $8,000 exchanged hands in the two month period between December 1981 and January 1982.[4] *See* FTC Ex. 87, and 89–91.

On the strength of the sales materials and representations, the purchasers signed a contract with Kitco. Several purchasers testified that they took out second mortgages to finance the business opportunity, while some used their life's savings. Snelling signed most of the contracts but Jesino-

ski also signed several. Farkas initialed the McKenzies' contract and signed the contract of James Cox above the designation "Executive Officer". The purchase price for the business opportunity varied from approximately $18,500 to $256,000, but the general price was around $23,865. Defendant Farkas admitted on cross-examination that Kitco sold at least $400,000 in business opportunities from August 1981 to the middle of 1983 when Kitco ceased business. In addition to testimony heard in court, the FTC has submitted consumer affidavits to show that Kitco sold $568,-787.25 worth of business opportunities.[5]

After paying an initial deposit, purchasers then came to Minneapolis to receive training and to finalize the contract. As mentioned above, several purchasers met with Snelling and/or Farkas before signing, and they were told that Kitco would provide immediate payment for finished products. Additionally, Steven Kocak testified that Farkas told him at a September 1981 meeting in Farkas' Kitco office that he would assist him in obtaining a loan to purchase the business opportunity. After a brief training session, defendants provided the purchasers with an initial purchase order contract. The contracts were mainly for "OPEN" or "CLOSED" signs, paint tray liners, or freezer trays.

Purchasers testified that the performance of Kitco was unsatisfactory. Delays in obtaining supplies were frequent and many purchasers received only one or two work orders. Upon completion of these products, the purchasers were unable to secure new purchase orders. Several were given various excuses when they asked for more work, and several testified that it became difficult to contact the defendants at all. One purchaser, Dale Davis, testified that he called the defendants 51 times with no result.

The purchasers also testified that they were sporadically paid for their finished

---

**4.** In another instance, Farkas' wife, Barbara, received a Kitco check for $610.00 in December 1981 (FTC Ex. 88). There is no evidence that she was a Kitco employee.

**5.** The admissibility of these affidavits will be discussed *infra.*

products.[6] Some were not paid at all. McGree testimony. Jensen testified that Farkas told him he would not be paid for "OPEN" and "CLOSED" signs because the colors were wrong, although Jensen had received his instructions from Kitco's personnel. Defendants represented that Kitco would pay cash for finished products, but it used a debit/credit accounting system to avoid payment. The record indicates that when defendants received a finished order, they often sent more plastic to the subcontractor than the person could use or did not enclose another purchase order. Thus, they could deduct the cost of plastic from the person's account.

In the summer of 1982, Snelling instructed Kitco subcontractors to ship all finished paint can trays to North 10th Street in Minneapolis, a location which he stated was a Kitco warehouse. See FTC Ex. 32 and 42. The location is, however, the address of Shamrock Industries (Shamrock), a plastic recycling company. Charles Osterud, Custom Sales Engineer for Shamrock, testified that between June and August 1982, Shamrock received more than 30,000 pounds of plastic, some scrap, but most in the form of finished paint trays, from Kitco subcontractors.[7] Osterud said that Snelling told him to go ahead and grind up the finished products. Snelling claimed that the paint can tray molds were improperly shaped and thus, useless. There is no evidence, however, that he notified any of the subcontractors of this deficiency or asked them to send the molds back. Nor was documentary evidence presented that Kitco demanded or received any sort of credit from the mold's manufacturer. Shamrock continued to receive finished products during August 1982, the time when Farkas admitted that he was Kitco's office manager. Osterud also testified that Snelling stated in August 1982 that ownership of Kitco was being passed to Farkas. It was Osterud's impression that Farkas had control of the organization.

In October 1982, Farkas began to operate Krown. Richard Hoch testified that he received payments for products he made for Kitco on checks captioned "John Farkas d/b/a Krown Manufacturing. See FTC Ex. 37 and 38. In addition, the record shows that between December 1982 and April 1983, Kitco employees Barton and Jesinoski received money from Farkas drawn on a Farkas d/b/a Krown checking account. See FTC Ex. 133–139. Neither Barton nor Jesinoski are Krown employees, however. See FTC Ex. 98, ¶ 5.

## II. DISCUSSION

### A. Admissibility of Farkas' Testimony

The FTC contends that the testimony of defendant Farkas should be stricken because he precluded its pretrial discovery by refusing to answer deposition questions based upon a claim of fifth amendment privilege. It argues that fairness requires that it be protected from surprise at trial from previously undisclosed information. The FTC also argues that, at the very least, an inference of wrongful conduct should be drawn in any areas formerly protected by Farkas' fifth amendment privilege.

Farkas contends, on the other hand, that he invoked the privilege only in regard to certain areas of inquiry and that he offered to waive the privilege after the close of the grand jury investigation. He also charges that the FTC, after having received timely notice that he would testify, waited until trial began to bring a motion to bar his testimony.

 After carefully considering the parties' position, the court finds that the testimony of Farkas should be admitted. No one disputes that Farkas was entitled to assert his fifth amendment privilege in response to those deposition questions where there was a danger of self-incrimina-

---

6. Richard Hoch testified that he was paid in full for the products he made for Kitco. He also testified that he received payment after visiting Farkas daily to demand money.

7. Kitco sent Shamrock a list of 19 subcontractors who would be sending in plastic. See FTC Ex. 86.

tion. Rather, the FTC claims that Farkas should not be able to exploit the amendment's protective shield by subsequently selectively testifying at trial. A complete bar of testimony seems unjustified in this instance, however, since the plaintiff did receive pretrial information from Farkas relating to certain areas of inquiry. Nor does a more limited ban on testimony seem appropriate. To be sure, the Federal Rules of Civil Procedure aim to prevent surprise, prejudice and perjury by ensuring full and fair mutual discovery before trial. *Duffy v. Currier*, 291 F.Supp. 810 (D.Minn.1968). The court has inherent power to monitor whether the assertion of a privilege causes unfair prejudice to the opposing litigant. *See Lyons v. Johnson*, 415 F.2d 540, 542 (9th Cir.1969), *cert. denied*, 397 U.S. 1027, 90 S.Ct. 1273, 25 L.Ed.2d 538 (1970); *Duffy v. Currier*, 291 F.Supp. 810 (D.Minn.1968). In the instant case the court finds that the FTC has not been unfairly surprised or prejudiced by Farkas' assertion of privilege and subsequent decision to testify at trial. The FTC thoroughly prepared its case and seemed able to anticipate through other witnesses what Farkas' testimony might be. It was not solely dependent upon the testimony of Farkas for pertinent information. Therefore, the testimony of Farkas has been considered in setting forth the facts in the previous section.

Notwithstanding the above, the court finds that it is proper to consider Farkas' previous invocation of privilege as circumstantial evidence in this civil matter. The policies underlying the fifth amendment protect criminal suspects from governmental coercion in the government's attempt to receive criminal confessions. *See Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964); *Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 520–521 (8th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). These policies apply with less force in a civil proceeding. *See, e.g., Garner v. United States*, 424 U.S. 648, 655–56, 96 S.Ct. 1178, 1182–83, 47 L.Ed.2d 370 (1976). In fact, the Supreme Court has held that the fifth amendment

does not preclude an adverse inference when the privilege is claimed by a party to a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). *See also Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509 (8th Cir.1984) (under certain circumstances, a party may call a witness even though witness has made known intention to invoke the fifth amendment). Where plaintiff's trial preparation has been hampered to some extent by defendant's assertion of privilege, the court finds it appropriate to consider evidence of Farkas' fifth amendment invocations.

## B. The FTC Act Claims

### 1. The Standard

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides that the FTC, in a "proper case", may seek a permanent injunction to enjoin violations of the Act. *United States v. JS & A Group, Inc.*, 716 F.2d 451, 456–57 (7th Cir.1983); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110–1111 (9th Cir.1982); *United States v. National Dynamics Corp.*, 525 F.Supp. 380, 380–381 (S.D.N.Y.1981); *FTC v. Virginia Homes Manufacturing Corp.*, 509 F.Supp. 51, 54 (D.Md.1981). In *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir.1982), the Ninth Circuit Court of Appeals held that consumer redress, including rescission of contracts, could be ordered in a routine fraud case under Section 13(b), 15 U.S.C. § 53(b). Conduct which violates Section 5 of the FTC Act, 15 U.S.C. § 45, is a proper case for consumer redress under Section 13(b).

Section 5, 15 U.S.C. § 45, provides in pertinent part that "unfair or deceptive acts or practices in commerce, are hearby declared unlawful." Misrepresentations of material facts made to induce the purchase of goods or services constitute unfair or deceptive acts or practices prohibited by Section 5(a). *See, e.g., Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3rd Cir.1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *National Trade Publi-*

*cations Service, Inc. v. FTC,* 300 F.2d 790, 792 (8th Cir.1962); *Goodman v. FTC,* 244 F.2d 584, 603–04 (9th Cir.1957); *Charles of the Ritz Distributors Corp. v. FTC,* 143 F.2d 676, 679–80 (2d Cir.1944). In particular, it is deceptive to misrepresent the benefits of a business opportunity. *See, e.g., Windsor Distributing Co.,* 77 F.T.C. 204, 212, 220 (1970), *aff'd,* 437 F.2d 443 (3rd Cir.1971); *Universal Electronics Corp.,* 78 F.T.C. 265, 271–272, 294 (1971). Misrepresentations concerning expected profits from a business or investment opportunity made to a prospective purchaser violate Section 5(a). *See Goodman v. FTC,* 244 F.2d 584, 596, 599 (9th Cir.1957); *In re Amway Corp.,* 93 F.T.C. 618, 729–32 (1979); *Universal Electronics Corp.,* 78 F.T.C. 265, 271–74 (1971).

▆▆▆ To obtain the monetary equivalent of rescission from any individual defendant, the FTC must prove that the individual had knowledge that Kitco or one or more of its agents engaged in dishonest or fraudulent conduct. *FTC v. International Diamond Corp.,* 1983–2 Trade Cas. (CCH) ¶ 65,725 (N.D.Ca.1983). The Commission may show actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. *See United States v. Baumann,* 614 F.2d 634 (9th Cir.1979), *cert. denied,* 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980); *FTC v. International Diamond Corp.,* 1983–82 Trade Cas. (CCH) ¶ 65,725, at 69,707 (N.D.Ca. 1983). In addition, the FTC must show that the defendants directly participated in the acts or had the authority to control the conduct. *FTC v. H.N. Singer, Inc.,* 1982–83 Trade Cas. ¶ 65,011 at 70,618–19 (N.D. Ca.1982); *FTC v. International Diamond Corp.,* 1983–82 Trade Cas. (CCH) ¶ 65,725 at 69,707–69,708 (N.D.Ca.1983). Authority to control a company is evidenced by active involvement with business matters and corporate policy including assumption of officer duties. *See, e.g., Consumer Sales Corp. v. FTC,* 198 F.2d 404, 408 (2d Cir. 1952), *cert. denied,* 344 U.S. 912, 73 S.Ct.

335, 97 L.Ed. 703 (1953). Finally, the Commission must show that the misrepresentations were the type upon which a reasonable and prudent person would rely and that consumer injury resulted. *See, e.g., FTC v. Algoma Lumber Co.,* 291 U.S. 67 (1934); *Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (3d Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *Charles of the Ritz Dist. Corp. v. FTC,* 143 F.2d 676, 679–80 (2d Cir.1944); *FTC v. International Diamond Corp.,* 1983–82 Trade Cas. (CCH) ¶ 65,725 at 69,-709 (N.D.Ca.1983).

### 2. Direct Participation in Misrepresentations

▆▆▆ In the instant case, the FTC has shown that defendants Snelling and Farkas directly misrepresented material facts to induce purchasers to invest in Kitco. Snelling and Farkas initially attracted potential purchasers by falsely advertising that Kitco offered contract work and a "nice income." Additionally, Farkas helped to finance the deceptive brochure put out by Kitco. Both Snelling and Farkas met with potential purchasers and represented that Kitco provided ongoing contract work, paid its subcontractors immediately for their finished products and offered high earning profit and potentials. Profit claims ranged as high as $50,000/year while earnings claims were as high at $170,000/year. Defendants' exaggerated profit and earning prediction cut to the core of the customer's decision to invest in Kitco. Defendant Farkas also used his Formaster business to solicit purchasers for Kitco. These misrepresentations violate Section 5 of the FTC Act, 15 U.S.C. § 45. *See, e.g., Resort Car Rental System, Inc. v. FTC,* 518 F.2d 962, 964 (9th Cir.1975), *cert. denied,* 423 U.S. 827, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *The Raymond Lee Organization,* 92 F.T.C. 489, 619 (1978), *aff'd,* 679 F.2d 905 (D.C.Cir. 1980).

### 3. Liability as Principal

▆▆▆ In addition to liability based on direct participation in the deceptive sale of

business opportunities, Snelling and Farkas are also liable for their roles as principals in Kitco. Snelling clearly had authority to control the company and knowledge of its fraudulent practices. As president of Kitco, Snelling hired Kitco sales representatives, provided them with Kitco contract forms and brochures to be used in sales transactions, signed company checks, and signed contracts with purchasers on behalf of the company.

Snelling's knowledge of the fraudulent Kitco operation is equally apparent. Snelling provided Kitco sales agents with the brochure that misrepresented the business opportunity. In one instance, he provided a sales agent with bogus contracts for work to show to prospective purchasers as examples of the work they would be doing for Kitco. In addition, he negotiated an agreement with Shamrock where Shamrock would ship Kitco subcontractors plastic and receive from them scrap for recycling. Snelling subsequently instructed Kitco subcontractors to send finished paint can trays to Shamrock, telling them that this was another Kitco warehouse. Kitco purchasers were never told that their products were being ground up and no evidence was introduced to show that Kitco tried to seek reimbursement for the faulty molds.

█ John Farkas' liability as a principal of Kitco from August 1981 is equally well-established. Farkas' role as a principal was demonstrated by consumer testimony and by his own admissiosnwhich show he possessed and exercised authority to control the company and had knowledge of its fraudulent practices. Mr. Farkas admitted he was office manager of Kitco, that he placed ads for the company, that he financed the printing of the deceptive Kitco sales brochure, and that he spoke with potential purchasers who called Kitco with questions concerning the business opportunity. At trial, Farkas tried to downplay all of his activities in Kitco, but he was not a credible witness. In certain circumstances, for Farkas to be believed, the testimony of each consumer witness would have to be discredited. The court found the consumers' testimony to be believable, and few were impeached even in a minor way. Moreover, Farkas admitted a certain level of involvement that is sufficient to hold him liable.

Farkas' knowledge of the deceptive practices is demonstrated by the fact that he personally engaged in them. Additionally, the purchaser witnesses testified that they repeatedly complained to Kitco and Farkas concerning the company's failure to meet the representations and perform on its promises. Farkas has admitted receiving complaints. He cannot then deny that he was aware of the problems that existed. These complaints should have put Farkas on notice. Moreover, Farkas knew that Kitco had a cash/flow problems as early as August 1981, yet he continued to represent that it was a reputable firm.

### 4. Consumer Reliance and Injury

█ Proof of reliance by the consumer upon the defendants' misrepresentations is a traditional element of recovery under common law fraud actions. Section 13 of the FTC Act differs from a private suit for fraud, however. Section 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers. Requiring proof of subjective reliance by each individual consumer would thwart effective prosecution of large consumer redress actions and frustrate the statutory goals of the section. Thus, the court is persuaded that the approach followed in another Section 13(b) case, *FTC v. International Diamond Corp.*, 1983–82 Trade Cas. (CCH) ¶ 65,725 at 69,709 (N.D.Ca. 1983), is correct. There the court found that the FTC need only prove that the alleged fraudulent practices were the type of misrepresentation on which a reasonably prudent person would rely, that they were widely disseminated, and that the injured consumers actually purchased the product. The burden then shifts to the defendants to prove that the misrepresentations were not relied upon by the consumers.

█ In the instant case, the FTC has shown that these practices were the type

upon which a reasonably prudent person would rely. Testimony at trial indicated that most of the eight purchasers checked Kitco's business references, as well as organizations like the Better Business Bureau or the Chamber of Commerce before deciding to buy. Moreover, the FTC showed subjective reliance by these eight witnesses. Based upon the representations of ongoing contract work and a profitable business, many of these people made a substantial sacrifice to purchase the opportunity, sometimes investing their life savings. Furthermore, the FTC demonstrated that the misrepresentations were widespread and that the seven of the eight who testified in court actually bought the Kitco opportunity. The FTC also entered into evidence 17 contracts between non-witness purchasers and Kitco. Additionally, the Commission introduced FTC Ex. 86 which demonstrates that the 20 individuals listed are Kitco subcontractors.[8] Defendants did not rebut this showing.

### 5. The Amount of Recovery

#### a. Admissibility of Consumer Affidavits

The Commission claims that evidence produced at trial provides the basis for admitting the 20 signed and sworn affidavits of Kitco purchasers who did not appear as witnesses. The FTC seeks to offer the affidavits as further proof of consumer purchase, subsequent injury and entitlement to restitution. Defendant Farkas attacks the consumer affidavits as untrustworthy and self-serving. He argues that the consumer contracts do not sufficiently guarantee the trustworthiness of the affidavits and are of little help in determining damages.

FRE 803(24) provides a residual exception to the hearsay rule where the proffered evidence has "circumstantial guarantees of trustworthiness" equivalent to those inherent in the other exceptions to the hearsay rule. In addition, the court

must determine that: 1) the statement is offered as evidence of a material fact; 2) the statement is more probative on the point than any other evidence which the proponent can procure through reasonable efforts; and 3) the general purpose of the rules and the interests of justice are best served by admission of the statement into evidence. Finally, the proponent must provide sufficient notice to the adverse party in advance of trial. The FTC satisfied this last requirement by bringing a pretrial motion *in limine* which the court denied.

 Notwithstanding the previous denial, the court finds that evidence given at trial establishes the trustworthiness of many of the consumer affidavits on the issue of consumer purchase and damages.

Eight Kitco purchasers testified at trial that defendants and their sales agents made material representations concerning the Kitco business opportunity and that these representations were false, deceptive and misleading. These eight witnesses also testified that they relied on the misrepresentations and were induced to enter contracts with Kitco. The Commission further offered proof that the Kitco sales brochure and Kitco ads were deceptive and that the defendants used a variety of corporate identities to induce the sales of the business opportunity. This cumulative testimony demonstrates that the defendants engaged in a widespread pattern and practice of deception. Each affiant sets forth facts relating to defendants' misrepresentations which are consistent with the testimony and documentary evidence introduced at trial.

Even more importantly, the Commission offered in evidence contracts between Kitco and 17 non-witness consumer purchasers. While these contracts do not establish the amount actually paid by the purchasers, many of the subcontractors appear on Kitco's list it sent to Shamrock. This list, FTC Ex. 86, establishes that the subcon-

---

**8.** The following individuals appeared on the list: George Banas, Duane Carver, Roger Christopherson, Dale Davis, William Duff, John Fitzpatrick, William Gulick, Daniel Jensen, Loren Jones, Ray Kerkstra, Stephen Kocak, Dennis Krook, Dennis Mourning, Richard Payton, Thomas Redington, Paul Sabol, James Selig, Deral Thiele, Carla Theines, and Ralph Wasem.

tractors did pay the purchase price for the machine and business opportunity. Accordingly, the court will admit the affidavits of all but William Andrachuk, Janice Babbitt, Wayne Springer, Jayanti Solanki, and Jim Sullivan to prove total consumer injury and establish the amount of the monetary equivalent of rescission.[9] These affidavits are more probative on the issue of total liability than any other reasonably obtainable evidence. It would be too expensive and time consuming to call witnesses from all parts of the United States merely to establish total consumer injury or even to take each consumer's deposition. In this case, corporate records were unavailable. Thus, unless the affidavits are admitted into evidence, there will be only limited proof of total injury suffered by the innocent purchasers. Accordingly, the interests of justice are best served by admitting the 15 consumer affidavits into evidence.

■ These affidavits plus evidence from the eight consumer witnesses at trial indicate that the total consumer injury is $531,949. This figure takes into account any amount which was already received as partial execution of judgment by any individual and deducts the small profit of the only person who made one. The breakdown is as follows:

| SUBCONTRACTOR | AMOUNT PAID | |
|---|---|---|
| George Banas | $ 22,500.00 | |
| Duane Carver | $ 23,865.00 | |
| Roger Christopherson | $ 23,387.00 | |
| James Cox | $ 7,500.00 | – ($10,000 paid less $2,500 received as partial execution of judgment) |
| Dale Davis | $ 18,500.00 | |
| William Duff | $ 23,865.00 | |
| John Fitzpatrick | $ 23,385.00 | |
| William Gulick | $ 23,865.00 | |
| Richard Hoch | $ 22,085.00 | – ($3,000 profit deducted) |
| Daniel Jensen | $ 23,387.00 | |
| Loren Jones | $ 23,865.00 | |
| Ray Kerkstra | $ 23,388.00 | |
| Steven Kocak | $ 23,865.00 | |
| Dennis Krook | $ 21,050.00 | |
| Mark McGree | $ 23,387.00 | |
| Richard McKenzie | $ 18,500.00 | |
| Dennis Mourning | $ 23,865.00 | |
| Richard Payton | $ 23,865.00 | |
| Thomas Redington | $ 23,865.00 | |
| Paul Sabol | $ 18,500.00 | |
| Phyllis S. Selig | $ 23,865.00 | |
| Ralph Wasem | $ 23,865.00 | |
| Deral Thiele | $ 23,865.00 | |
| Carla Theines | $ 23,865.00 | |
| TOTAL | $531,949.00 | |

9. The affidavits of Solanti and Sullivan are unsupported by evidence of a contract or by Kitco's admission that they were subcontractors. There is therefore no circumstantial evidence that they even purchased the business opportunity. While the FTC has produced contracts for Andrachuk, Babbitt, and Springer, it has not produced any additional evidence suggesting that the purchase price was indeed fully paid.

*FTC v. H.N. Singer, Inc.*, 1983–82 Trade Cas. (CCH) ¶ 65,011 (N.D.Ca.1982) and *FTC v. International Diamond Corp.*, 1983–82 Trade Cas. (CCH) ¶ 65,725 (N.D.Ca.1983),

establish that defendants may be liable for the full amount of the monetary equivalent of rescission, even though it may exceed the amount of a defendant's unjust enrichment. The court finds that defendants Snelling and Farkas are jointly and severally liable for this amount.

### b. Collateral Estoppel or Judicata

### Effect of Private Law Suits

■ Defendant Farkas argues that two individual private lawsuits filed by Kitco purchasers against him bars these individuals from receiving restrictions under the FTC Act. It is questionable, however, whether Farkas may maintain the defense of res adjudicata or collateral estoppel at this late date. Fed.R.Civ.P. 8(c) provides that res judicata or collateral estoppel are affirmative defenses which must be pleaded by the defendants. Failure to do so in a reasonable manner results in waiver. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607 n. 19, 95 S.Ct. 1200, 1210 n. 19, 43 L.Ed.2d 482 (1975); *Blonder-Tongue Lab., Inc. v. Univ. of Ill. Foundation*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971). Farkas did not plead either of these defenses.

■ Even assuming that the court finds no waiver, the burden of establishing claims or issue preclusion is placed upon the party claiming it. *See Blonder-Tongue Lab., Inc.*, 402 U.S. at 450, 91 S.Ct. at 1453. Defendant has failed to present proof of the claims or issues involved, of the causes of action under which the former proceedings were litigated, or on what basis suits were won or lost. Thus, there is insufficient evidence to even determine whether the requisite for res judicata or collateral estoppel are even present. *See, e.g., Fed. Ins. Co. v. U.S.*, 618 F.2d 661, 663 (10th Cir.1980).

### 6. Injunctive Relief

■ District courts have discretion to model orders to fit the exigencies of the particular case and the power to enjoin related unlawful acts which may be fairly anticipated from defendant's past conduct. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132, 89 S.Ct. 1562, 1581, 23 L.Ed.2d 129 (1969); *NLRB v. Express Publishing Co.*, 312 U.S. 426, 436–37, 61 S.Ct. 693, 699–700, 85 L.Ed. 930 (1941). *See also Benrus Watch Co. v. FTC*, 352 F.2d 313, 324 (8th Cir.1965), *cert. denied*, 384 U.S. 939, 86 S.Ct. 1457, 16 L.Ed.2d 538 (1966) (Commission order covering all products manufactured by company upheld); *Guziak v. FTC*, 361 F.2d 700, 705–06 (8th Cir.1966), *cert. denied*, 385 U.S. 1007, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967). Even if the defendants have altered some of their deceptive practices, injunctive relief is still appropriate when there is a "cognizable danger of recurrent violation." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See also CFTC v. Co Petro Marketing Group, Inc.*, 502 F.Supp. 806, 818 (C.D.Ca.1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982). Past unlawful conduct is a critical element in determining the likelihood of future violations. *See CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979); *CFTC v. British American Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir.1977), *cert. denied*, 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978). Moreover, the egregious nature of past violations is a factor supporting the need for permanent injunctive relief of a broad nature. *Cf. SEC v. Blatt*, 583 F.2d 1325, 1334 at n. 29 (5th Cir.1978). In the instant case, the egregious nature of the defendants' deceptive practices warrants an order prohibiting misrepresentations in the sale of any business opportunity, product, or service. Snelling and Farkas used various corporate entities to pursue their illegitimate business activities and an injunction restraining the now-defunct Kitco would have no effect. A broad injunction is necessary to protect the public from further violations of the FTC Act. Moreover, such an injunction does not unduly harm the defendants. It does not put them out of business, but simply ensures that they will conduct their

business in a manner which does not violate Section 5 of the FTC Act, 15 U.S.C. § 45.

## C. Default Judgment Against Defendant Jesinoski

 Fed.R.Civ.P. 12 provides that a defendant shall file his or her answer or otherwise defend within 20 days of service. If a defendant fails to do so, a default judgment may be entered. Fed.R.Civ.P. 55(b)(2) commits the entry of a default judgment to the discretion of the trial court.[10] *FTC v. Packers Brand Meats, Inc.*, 562 F.2d 9, 10 (8th Cir.1977). *See also* 10 Wright, Miller & Kane *Federal Practice and Procedure: Civil* § 2685 at 420–421 (1983). The court may consider a number of factors including the amount of money potentially involved, whether issues of fact exist, whether the default is largely technical, and whether the grounds for default are clearly established. 10 Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 2685 at 423–426 (1983). Fed.R. Civ.P. 55 does not require a hearing before an entry of default. If the court determines that a defendant is in default, the factual allegations of the complaint will be taken as true. *Thompson v. Wooster*, 114 U.S. 104, 5 S.Ct. 788, 29 L.Ed. 105 (1885); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61 (2d Cir.1981). This rule applies to cases seeking equitable as well as legal relief. *Thompson v. Wooster*, 114 U.S. 104, 110, 5 S.Ct. 788, 791, 29 L.Ed. 105 (1886).[11]

 In the instant case, the summons and complaint in the proceeding were served on defendant Jesinoski on July 31, 1984 by Deputy Sheriff Ernest Myer of the Sherburne County Sheriff's Department.[12] Jesinoski has failed to respond in any manner since that time. At least eight months have elapsed since the FTC was entitled to Jesinoski's responsive pleading. Almost five months have passed since the FTC moved for the court to enter a default judgment requiring Jesinoski to pay restitution and to enjoin him from future violations of the FTC Act. This is clearly not a case where defendant attempted to respond to plaintiff's complaint after the time for responsive pleading expired. *See, e.g., Dr. Ing. H.C.F. Porsche A.G. v. Zim*, 481 F.Supp. 1247, 1248 at n. 1 (N.D.Texas 1979).

In addition, a court trial on the merits has been held concerning the Kitco operations. While Jesinoski was not being tried, credible evidence was produced at trial which suggested that Jesinoski played a direct role in misrepresenting Kitco's business opportunity and that he held himself out as a principal in the organization.

Moreover, the FTC has established the propriety of restitution for Kitco purchasers in the amount of $531,949.00. Jesinoski has known for approximately five months that the FTC planned to seek consumer restitution upon default and he has not contested the amount of the claim. The court also finds that it is appropriate to enjoin Jesinoski from engaging in violations of Section 5 of the FTC Act, 15 U.S.C. § 45.

## ORDER FOR JUDGMENT

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

---

**10.** Rule 55(b)(1) provides that a judgment by default may be entered in two ways: 1) by the Clerk if plaintiff's claim "is for a sum certain or for a sum which can by computation be made certain" and 2) by the court in all other cases. Because plaintiff seeks a judgment that includes injunctive relief and restitution for injured consumers, plaintiff's claim against defendant Jesinoski in the case at bar is not for a sum certain. Default must then be entered by the court.

**11.** *Thompson v. Wooster* has been cited as the "venerable, but still definitive case" on this subject. *See Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 63 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

**12.** Defendants Duane Snelling and John Farkas each were served with a summons and complaint in this proceeding on June 9, 1983, a full year before Jesinoski was served. Jesinoski disappeared in an apparent effort to evade process.

1. The complaint is dismissed against defendant Jason Barton without prejudice.

2. The complaint is dismissed against defendant Kitco of Nevada, Inc., d/b/a Kitco, Inc., d/b/a Krown Manufacturing Co., with prejudice.

3. Defendant Craig A. Jesinoski is in default for failure to plead or otherwise defend in this action.

4. Pursuant to Section 13(b) of the FTC Act, 15 U.S.C. 53(b), plaintiff is entitled to a permanent injunction enjoining defendants Duane F. Snelling, John E. Farkas, and Craig A. Jesinoski, their employees, agents, representatives, and all those acting in concert with them in connection with the advertising, marketing or selling of any business opportunity in or affecting commerce, from misrepresenting, orally, or in writing:

(a) the nature and extent of any service or other assistance to be provided to any person who purchases such business opportunity, including but not limited to, assistance in sales or marketing;

(b) the frequency or method of payment for any products manufactured or sold as part of such business opportunity;

(c) the performance, efficiency or production capacity of any machine sold as part of such business opportunity;

(d) the past, current, or likely future income or profits of any purchaser of such business opportunity; and

(e) the amount and duration of work that will be provided to the purchaser of such business opportunity.

"Business opportunity" for the purposes of this Order for Judgment means any written or oral arrangement whereby defendants:

(a) provide or offer to provide to an investor, in connection with the establishment of a new business or the operation of an on-going business, either goods, commodities, services or assistances; or

(b) provide or offer to provide to an investor, permission to offer, sell or distribute goods, commodities or services which are identified by a trademark, service mark, trade name, advertising or other commercial symbol.

5. Pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), plaintiff is entitled to entry of judgment against defendants Duane F. Snelling, John E. Farkas, and Craig A. Jesinoski, jointly and severally, in the amount of $531,949.00 to redress the consumer injury which resulted from the defendants' violations of the FTC Act. Any amounts defendants contribute toward this sum shall be paid into an escrow account established by the Federal Trade Commission for distribution as restitution to the injured consumers. The FTC may submit a plan of allocation to this court for approval as is necessary.

6. Plaintiff is entitled to its costs.