**FEDERAL TRADE COMMISSION**

v.

**NATIONAL BUSINESS CONSULTANTS, INC., et al.**

**Civ. A. No. 89–1740.**

United States District Court, E.D. Louisiana.

Nov. 8, 1991.

Janice Charter, F.T.C., Denver, Colo. for F.T.C.

Robert Namer, pro se.

James F. Quaid, Jr., Nat. Business Consultants, Metairie, La., for Nat. Business Consultants.

Susan Marie Chehardy, Gennusa, Brandt & McDonald, Metairie, La., for First Nat. Bank of Jefferson and Chehardy, Sherman, Ellis & Breslin.

Kenneth William Kirchem, New Orleans, La., for Robin Acrey, Hugh Garner, Rachel Hendricks, Pamela Ledet, Dale Logan, Laura Morgan, David Starr, Edwin Webster and Kenneth Kirchem.

Alvin Andrew LeBlanc, Jr., DeMartini, LeBlanc, Kenner, La., for First Nat. Bank of Jefferson Parish.

Fred J. Cassibry, Jan T. van Loon, Brook, Morial, Cassibry, Fraiche & Pizza, New Orleans, La., for Brook, Morial, Cassibry, Fraiche & Pizza.

A. Michael Dufilho, Taylor, Porter, Baton Rouge, La., for Deposit Guar. Nat. Bank.

Eneid A. Francis, U.S. Atty's Office, New Orleans, La., for U.S.

Rudy J. Cerone, New Orleans, La., for Rudy J. Cerone.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter is presently before the Court solely on the issue of relief/damages to be awarded for consumer redress. The issue, set for evidentiary hearing on October 23, 1991, was taken under submission without oral argument.

## PRELIMINARY STATEMENT

The captioned matter was previously in another section of the court.[1] On July 28,

---

1. This case was originally assigned to Judge Wicker; however, following her recusal on July 23, 1991 the case was re-allotted to this Section

1989, after a bench trial, the issue of liability was decided and oral reasons were given that the defendant Robert Namer was conducting a franchise operation in National Business Consultants, Inc. ("NBC") also named a defendant herein. The law of the case is further that Namer violated the Federal Trade Commission's ("FTC") Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," 16 C.F.R. § 436 ("the Franchise Rule"), by misrepresentations and omissions.[2] Written finding of facts and conclusions of law on the issue of liability were entered in the record on March 20, 1990.[3] The defendants then appealed to the Fifth Circuit.[4] After resolving a dispute over the docketing fee,[5] the appellate court denied the defendants' petition for writ of prohibition and/or writ of mandamus.[6] Said written findings are the law of the case and are incorporated herein and are so adopted.

## FACTUAL BACKGROUND

While allotted to Section "K" of this court, the record reflects the following with respect to the issue of relief/damages:

(1) An order of reference to the Magistrate Judge for a trial on damages.[7]

(2) A motion by the FTC (and memorandum in support) for the award of consumer redress based on evidence in the record,[8] to which the defendants' filed an opposition.[9]

(3) Pursuant to leave of court, the FTC supplemented its motion for consumer redress, delineating an itemization of "performance deposits" paid to NBC and refunds, if any, paid to "associate consultants" and "sales consultants" from April 20, 1986 through October 1989 compiled from the line item entries that are contained in NBC's ledgers which suggests $3,019,377 as the amount of consumer redress to be awarded.[10]

(4) The Magistrate Judge established a procedure by which the defendants could controvert and the FTC could support the quantum of damages the FTC found to be due.[11] The Magistrate Judge's Minute Entry Order stated:

After considering plaintiff's opposed motion for award of consumer redress on the basis of record evidence, and argument of plaintiff and defendants, **IT IS ORDERED** that:

(1) Plaintiff shall file within 10 days its objections to defendants' claims that "seventy associate consultants" have submitted sworn statements attesting to their support and/or approval of defendants' conduct towards them;

(2) Defendants shall submit within 30 days its response to plaintiff's objections;

(3) Defendants may submit within 30 days additional affidavits provided each affidavit specifies affiant, affiant's address and phone number, relationship to defendants, time period of relationship, whether affiant seeks monetary redress from defendant, and whether affiant re-

---

of the Court. Document 481 of the record herein.

2. Proceeding, Document 147 of the record herein.

3. Order and Reasons, March 19, 1990 [hereinafter Findings]. Document 258 of the record herein. A copy of the Findings are attached as an Appendix 1 hereto.

4. Document 268 of the record herein.

5. Documents 330 & 365 of the record herein.

6. Document 377 of the record herein.

7. Order of Reference to U.S. Magistrate, February 7, 1990. Document 235 of the record herein.

8. Motion (and Memorandum in Support) for Award of Consumer Redress on the Basis of Record Evidence, filed by FTC on March 21, 1990. Document 259 of the record herein.

9. The defendants' response was filed on March 30, 1990. Document 263 of the record herein.

10. FTC's Supplement to Motion for Award of Consumer Redress on Basis of Record Evidence, filed April 27, 1990. Document 281 of the record herein.

11. Minute Entry, Lemelle, M., April 25, 1990. Document 282 of the record herein.

ceived or was promised anything of value for providing the affidavit along with details if value was received or promised;

(4) Plaintiff may submit its objection to new affidavits thusly submitted by defendants—objections will be due within 20 days after receipt of the new affidavits;

(5) Supplemental memoranda, including suggested findings and recommendation, on the issue of consumer redress may be submitted by both parties on or about June 25, 1990.

Thereafter, the Magistrate will issue findings and recommendation to the District Judge on the noted issue.

(5) The defendants appealed the procedure established by the Magistrate Judge to the District Judge [12], and the FTC responded.[13] On August 8, 1990, after hearing oral arguments, the motion was denied.[14]

(6) In accordance with the procedure established by the Magistrate Judge:·

(a) The FTC filed objections to the defendants' claims; [15]

(b) The defendants responded to the FTC's objections; [16] and

(c) The FTC submitted its supplemental memorandum.[17]

(7) The Magistrate Judge ordered, in accordance with established procedure in this court, the parties to submit, no later than April 26, 1991, their witness lists and lists of exhibits to be offered at an evidentiary hearing on the issue of relief/damages to be awarded and a separate summary of suggested facts, pertinent law and appropriate relief to be awarded.[18] Subsequently, the parties were granted an extension of twenty days (until May 16, 1991) to accomplish this.

(8) The defendants filed their witness list [19] and the FTC filed both its witness list and a separate summary of suggested facts, pertinent law and appropriate relief to be awarded.[20]

On July 23, 1991, as hereinabove noted, this case was reassigned to this section of court,[21] which on October 1, 1991 withdrew the reference to the Magistrate Judge with respect to the issue of damages and set the matter for evidentiary hearing on Wednesday, October 23, 1991.[22] By order of this Court dated October 17, 1991, the defendants' witness list was stricken from the record for failure to comply with the standing order of all sections of this Court that witness lists set forth the nature of the testimony to be given by each witness.[23]

Furthermore, contrary to the Court's order, the defendants failed to file a separate summary of suggested facts, pertinent law and appropriate relief to be awarded. Neither party has supplemented the record further than as set out in (8) above with

---

12. Defendants Notice of Appeal, filed May 4, 1990. Document 288 of the record herein.

13. Plaintiff's Response to Defendants' Brief on Appeal of Magistrate's Order of April 25, 1990, to Award Consumer Redress on the Basis of Record Evidence, filed May 17, 1990. Document 298 of the record herein.

14. Proceeding, Document 333 of the record herein.

15. Plaintiff's Objections to Defendants' Claims, filed May 8, 1990. Document 290 of the record herein.

16. Defendants Response to Plaintiff's Objections to Defendants Claims, filed May 16, 1990. Document 297 of the record herein.

17. FTC's Supplemental Memorandum on the Issue of Consumer Redress, filed June 22, 1990. Document 312 of the record herein.

18. Minute Entry, Lemelle, M.J., March 27, 1991. Document 441 of the record herein.

19. Witness List, filed May 13, 1991. Document 464 of the record herein.

20. FTC's List of Witnesses and Exhibits on the Issue of Relief/Damages, filed May 16, 1991, and FTC's Separate Summary of Suggested Facts Pertinent Law, and Appropriate Relief, filed May 16, 1991. Documents 468 and 469 of the record herein.

21. Minute Entry, Wicker, J., July 23, 1991. Document 481 of the record herein. *See supra,* footnote 1.

22. Minute Entry, October 1, 1991, Schwartz, J. Document 524 of the record herein.

23. Minute Entry, October 17, 1991, Schwartz, J. Document 530 of the record herein.

respect to the matters set out in (7) above. Upon a review of the entire record the Court determined that a further evidentiary hearing was unnecessary to decide the issue of damages.[24] Thereafter, because both of the defendants ignored and failed to comply with the Court's orders regarding the submission herein of accountings, it ordered the defenses of the defendants as to the issue of relief/damages to be awarded for consumer redress stricken and has proceeded to decide this issue based solely on the evidence in the record as of October 31, 1991.[25]

To the extent any of the findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law constitute findings of fact, they are so adopted.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Where, as here, a permanent injunction under sections 13(b) and 19(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 53(b) and 57b(b) ("the FTC Act"), has been issued, consumer redress is appropriate. Section 19(b) of the FTC Act provides that the court:

> shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation.... Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages....

The Court, having previously found that the defendants violated the FTC's Franchise Rule, now turns to redress due the injured franchisees which is the appropriate remedy under Section 19(b). *Federal Trade Commission v. Southwest Sunsites, Inc.*, 665 F.2d 711, 720 (5th Cir.), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982).

The Court has also previously found that the defendants have violated FTC Act Section 5, through both material affirmative misrepresentations and omissions. "Conduct which violates Section 5 of the FTC Act ... is a proper case for consumer redress under Section 13(b)." *Federal Trade Commission v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D.Minn.1985); *See Federal Trade Commission v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314–16 (8th Cir.1991).

On July 28, 1989, this Court determined that because of the defendants' violations of the Franchise Rule and Section 5 of the FTC Act that a permanent injunction should issue in this case pursuant to Section 13(b) of the FTC Act. Accordingly, the Court is thus empowered to exercise the full breadth of its equitable authority, to impose such relief as is necessary to remedy the violations found, including restitution. *Southwest Sunsites*, 665 F.2d at 718; *Federal Trade Commission v. H.N. Singer, Inc.*, 668 F.2d 1107, 1113 (9th Cir. 1982). This Court finds that the appropriate remedy herein is that the defendants pay redress to the victims of their deceptive practices.

With respect to determining damages the FTC does not need to prove individual reliance on defendants' material representations and omissions; rather, the proper standard to establish reliance in an FTC action, as here, is based on a pattern or practice of deceptive behavior. *Security Rare Coin & Bullion Corp.*, 931 F.2d at 1316; *Federal Trade Commission v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct.

---

**24.** Minute Entry, October 22, 1991, Schwartz, J. Document 536 of the record herein.

**25.** Minute Entry, October 31, 1991, Schwartz, J. Document 539 of the record herein. On November 1, 1991, NBC filed a response to this Court's order of August 30, 1991 regarding the submission of its accounting. Said response, however, does not fully comply with that order.

Although the Court has taken cognizance of and considered the accounting that was submitted, it has no bearing on the issue being decided herein. In other words, the Court has now considered all of the defenses filed by the defendants in these proceedings, inasmuch as no further defenses were filed after the entry of this Court's order on October 31, 1991.

366, 107 L.Ed.2d 352 (1989); *Kitco of Nevada, Inc.*, 612 F.Supp. at 1291; *Federal Trade Commission v. International Diamond Corp.*, 1983–2 Trade Cas. (CCH) ¶ 65,725, at 69709, 1983 WL 1911, at *6–7 (N.D.Cal. Nov. 8, 1983). In *Security Rare Coin* the court held:

> To satisfy the reliance requirement in actions brought under section 13(b) of the Act, the FTC need merely show that the misrepresentations or omissions were of a kind usually relied upon by reasonable and prudent persons, that they were widely disseminated, and that the injured consumers actually purchased the defendants' products. (citations omitted.)

931 F.2d at 1316. The court specifically rejected the defendants' contention that the FTC should be required to prove subjective reliance by each investor and explained that such a requirement would defeat the purpose of the FTC Act, stating:

> It would be virtually impossible for the FTC to offer such proof, and to require it would thwart and frustrate the public purposes of FTC action. This is not a private fraud action, but a government action brought to deter unfair and deceptive trade practices and obtain restitution on behalf of a large class of defrauded investors. It would be inconsistent with the statutory purpose for the court to require proof of subjective reliance by each individual consumer.

*Id.*

The March 20, 1990 written findings of facts and conclusions of law herein demonstrate that the FTC has already met its burden of establishing reliance.[26] Specifically, the FTC has previously established that:

**26.** *See supra,* footnote 3 and accompanying text.

**27.** Specifically, the Court finds that defendants NBC and Namer did misrepresent and did omit information in the following areas: the number and type of potential clients, the relationship between NBC and its business and personal references, the rate of return of the performance deposits, the number of states in which NBC transacted business, geographic exclusivity, the role sales would play in an associate consultant's job, and pending litigation in which NBC and Namer were involved. *Trial testimony*

*(1) The associate consultants and sales consultants reasonably relied on defendants' misrepresentations and omissions.* The Court has heretofore ruled herein that:

> An act or practice is deceptive under Section 5 of the FTC ACT, 15 USC 45(a), if there is a "representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, and the representation, omission, or practice is material...." *Cliffdale Associates, Inc., et al,* 103 FTC 110, 164–165 (1984). *See also Southwest Sunsites, Inc. v. FTC,* 785 F.2d 1431, 1435 (9th Cir.1986).
>
> ....
>
> The Court finds that the defendants NBC and Namer have participated in unfair and deceptive trade practices in violation of Section 5(a) of the FTC Act, 15 USC 45(a), through a series of material misrepresentations and omissions.

Findings, p.19, ¶ 15 and p.21, ¶ 23. These rulings establish the first element of the FTC's reliance burden, that the consultants acted "reasonably" in relying on the defendants' material misrepresentations.[27]

*(2) The defendants' misrepresentations and omissions were widely disseminated.*

The Court further ruled herein that: "NBC advertises in trade journals and national periodicals such as *The Wall Street Journal* and *USA Today.* Namer and others at NBC mail literature to, place telephone calls to, and receive telephone calls from prospective consultants who are in states other than Louisiana." Findings, p.3, ¶ 2. Thus, the deceptive practices were widely disseminated without the basic disclosures required under the Franchise Rule.[28]

established that these areas of misrepresentation and omission were material. (emphasis added.) Findings, p.7–8, ¶ 15. The nature of these representations also supports "reasonable" reliance by the consultants.

**28.** The Franchise Rule requires that the franchisor provide prospective franchisees with a basic disclosure document, at least ten business days prior to entry of a contract or payment of money or at the first personal meeting, whichever is earlier. 16 CFR 436.1, 436.2(g). NBC and Namer have not made the disclosures required by the Franchise Rule

*(3) The consultants purchased the business opportunities deceptively offered by the defendants.*[29]

The Court also ruled herein that:

The associate consultants were required to pay NBC a performance deposit or bond of $7,500; the bond to be paid by the sales consultants came to $750. These deposits were tendered generally by cashiers checks, certified checks or personal checks.... The performance bond was paid before the initial training period concluded.

. . . .

... In this case, the weight of the credible evidence adduced at trial established that Namer granted or promised the right to distribute business consulting services.... [and] consultants were required to pay at least $500 before beginning their relationship with NBC and Namer.

Findings, p.4, ¶ 5 and p.7, ¶ 14. Thus, the FTC has met the last element of its burden of proof with regard to reliance.

■ Once the appropriateness of redress has been established as set forth hereinabove, the burden then shifts to the defendants to prove that the misrepresentations were not relied upon by the consumers. *Kitco of Nevada, Inc.,* 612 F.Supp. at 1293. The defendants have not presented any evidence to rebut the showing of reliance on their misrepresentations by any consultant. Moreover, the material omissions were a result of the defendants' failure to provide every purchaser of the defendants' franchises the disclosure document required by the Franchise Rule. The defendants have failed to refute the presumption of reliance established with respect to their material omissions.

Redress is due to each associate consultant and sales consultant who paid a "performance deposit" of $500 or greater during the period from April 19, 1986, to the present. This includes all of such who failed to receive a disclosure statement in violation of the FTC's Franchise Rule, beginning three years before the FTC filed its complaint in this action.[30]

■ Generally, the amount of restitution in FTC consumer redress cases is the purchase price of the relevant product or business opportunity, less any refunds or money earned. *Federal Trade Commission v. Atlantex Associates,* 1987–2 Trade Cas. (CCH) ¶ 59,245, at 59,256, 1987 WL 20384, at *14 (S.D.Fla.1987); *International Diamond,* 1983–2 Trade Cas. (CCH) at 69,-709, 1983 WL 1911, at *7; *Kitco of Nevada, Inc.,* 612 F.Supp. at 1295. Deduction of the individual earnings is inappropriate in this case because NBC consultants paid their "performance deposits" under the express agreement with the defendants that this money would be returned to them once they reached a certain level of revenue. The defendants' misrepresentations regarding the ease with which the "performance deposit" could be refunded composed a large part of the various and sundry misrepresentations. Equity requires that these victims be put in the same position with respect to such deposits that they would have been in had their reasonable expectations been fulfilled, i.e., a full refund of the "performance deposits." Since any refunds paid to "consultants" represented a portion of their "performance deposits," those amounts shall be deducted to arrive at the appropriate amount of redress.

■ No further evidentiary proceeding is necessary prior to entry of the redress

and accordingly the Court finds that NBC and Namer have violated 16 CFR 436.1(a-d). Findings, p.18–19, ¶ 14.

**29.** The business opportunities that the defendants deceptively offered were "franchises" as that term is defined in section 436.2(a) of the FTC's trade regulation rule entitled Disclosure Requirements and Prohibitions Concerning

Franchising and Business Opportunity Ventures, 16 C.F.R. Part 436. Findings, p. 18, ¶ 12.

**30.** The statutory limit for obtaining redress under Section 19(b) of the FTC Act is three years. Section 13(b) contains no such limitation, however, the FTC has not suggested extending redress beyond that three year period.

order against defendants because the defendants' business records, specifically the NBC general ledgers, are the best available evidence for determining the appropriate amount of redress. *See Kitco of Nevada, Inc.,* 612 F.Supp. at 1295. The NBC general ledgers corroborate that the correct redress amount is $3,019,377, which is itemized in the accounting attached to the FTC's Supplement to Motion for Award of Consumer Redress on the Basis of Record Evidence, filed April 18, 1990.[31]

The defendants have not presented *any* evidence or documents which demonstrate that any consultant included in the aforementioned accounting is ineligible for redress. The defendants have also not provided any probative evidence relative to the damage issue[32] that would cause this Court to reduce the redress amount of $3,019,377.

The authenticity of the documents that the defendants have submitted to Court in support of a downward revision of the redress amount proposed by the FTC and supported by NBC's own ledgers is suspect, particularly in light of the Court's prior finding that defendants gave partial refunds only if a consultant signed a laudatory letter for defendants' benefit. Findings, p.10, ¶ 19.

■ In *Hansen v. Continental Insurance Co.,* 940 F.2d 971, 984 n. 11 (5th Cir.1991), the Fifth Circuit held:

[T]o determine whether an award of prejudgment interest is appropriate, the court must determine whether such an award is precluded by the federal statute that gives rise to the cause of action, and if such an award is not precluded, whether it would further the congressional policies embodied in the act.

The FTC Act does not preclude an award of prejudgment interest. Furthermore, this Court has no doubt that an award of prejudgment interest under the FTC Act furthers the purposes of the statute by encouraging businesses who are found to have participated in unfair or deceptive acts or practices to settle with its consumers (through the FTC) quickly and fairly, thereby avoiding lengthy litigation. Thus, the payment of redress herein to victimized consumers shall include an award of prejudgment interest.

■ Further, attorneys' fees and costs shall be awarded to the plaintiff, particularly because of the defendants' filings herein, which have at times bordered on justifying the imposition of Rule 11 sanctions, and have caused great and undue and unnecessary expense in determining a proper resolution of this dispute. The plaintiff shall within thirty (30) days from the date of entry of the redress order herein submit an affidavit in support of reasonable fees and costs based on contemporaneous time records in accordance with Local Rule 20.16 of this Court.

31. NBC's general ledgers for the years 1986–89 are in evidence as Plaintiff's Exhibits 71A–C and 119. Each contain an itemized list (by name of consultant and date) of each performance deposit paid to NBC by each associate consultant and sales consultant (and a corresponding list of moneys refunded). A compilation of the line item entries is contained in Document 281 of the record herein. *See supra* footnote 10 and accompanying text.

32. For example, the defendants submitted approximately 100 statements to the Court pursuant to paragraph 3 of the Magistrate Judge's Minute Entry Order of April 25, 1990. None of the statements, however, complied with the form required by the order. *See supra* footnote 11 and accompanying text. The statements generally fall into several categories. Some reveal efforts by the consultant to obtain some performance from the defendants (such as a refund). Some are irrelevant because they state only that, in the consultant's opinion, NBC is not a franchise or never represented itself as a franchise. A few come from NBC home office employees, two of whom never paid performance deposits, and one of whom testified at the trial on liability that Namer forced him to sign the form affidavit under threat of being fired. Many are not notarized in any way and are unreliable as evidence. Some are NBC's standard "disclosure" and evaluation forms (also unnotarized), which the Court found that Namer would not accept unless favorably completed. Findings, p.15, ¶ 26. Most importantly, *none of the defendants' submissions state that NBC does not owe any monetary refund to the consultant.* Document 297 of the record herein. *See supra* footnote 16 and accompanying text.

■ The FTC must demonstrate, in order to find an individual liable for restitution under section 13(b), that it had some knowledge of the subject practices. *Amy Travel Service, Inc.,* 875 F.2d at 573. Some district courts have also required that the defendant knew or should have known that the conduct was dishonest or fraudulent. The FTC has demonstrated that Namer participated directly in the practices or acts or had authority to control them. Although the second requirement may not be necessary, the FTC has also shown that Namer knew or should have known that his conduct was dishonest and fraudulent. Therefore, both Namer and NBC are liable for consumer redress, jointly and severally.

■ Equity also requires that the asset freeze heretofore ordered herein shall remain in full force and effect on the assets of both (and each) of the defendant(s) until the money judgment entered in this case is fully satisfied. Accordingly,

IT IS HEREBY ORDERED that the defendants, National Business Consultants, Inc. and Robert Namer, are liable jointly and severally unto the plaintiff, Federal Trade Commission, in the sum of $3,019,-377.00, representing the relief/damages awarded for consumer redress, plus prejudgment interest from date of judicial demand and attorneys' fees and costs.

IT IS FURTHER ORDERED that the plaintiff shall within thirty (30) days from the date of entry of this redress order submit an affidavit in support of reasonable fees and costs based on contemporaneous time records in accordance with Local Rule 20.16 of this Court.

The Clerk of Court is ordered to enter judgment in accordance herewith.

1. Defendants also challenged the validity of the FTC's Franchise Rule itself, arguing that the Commission did not follow proper procedures in promulgating the Rule and that the Rule, as promulgated, is unconstitutionally vague. The Court finds no merit to either contention. In the first place, there was no convincing evidence submitted that the FTC did not follow the

APPENDIX 1

United States District Court
Eastern District of Louisiana

Federal Trade Commission

Versus

National Business Consultants, Inc. et al.

CIVIL ACTION NUMBER 89–1740

SECTION "L"(3)

March 20, 1990.

The Federal Trade Commission ["FTC"] brought this lawsuit seeking a permanent injunction against National Business Consultants, Inc. ["NBC"] and Robert Namer ["Namer"] to enjoin them from unfair and deceptive trade practices in the sale of alleged franchises under Sections 5(a), 13(b), and 19 of the Federal Trade Commission Act ["FTC Act"], (15 U.S.C. §§ 45(a), 53(b), and 57(b) [57b(b) ] as amended), and to enjoin them from violating the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" ["the Franchise Rule"], 16 CFR 436. The FTC also seeks to redress injury to consumers.

The issue of liability was tried before the Court on an earlier date. Based upon the evidence adduced at trial and after considering the briefs and arguments of counsel, and the applicable law, the Court gave oral reasons, finding that Namer was conducting a franchise operation in NBC and that Namer had violated the FTC's Franchise Rule by misrepresentations and omissions.[1] Accordingly, the Court granted the permanent injunction sought by the FTC and continued the asset freeze until such time as damages were determined.

Thereafter the defendants brought a motion to dismiss the plaintiff's complaint which was heard and taken under submis-

guidelines of the Administrative Procedure Act, 5 U.S.C. § 553, or, if applicable, the guidelines of the Magnusom–Moss amendment to the Franchise Disclosure Rule [Pub.L. No. 93–637, 88 Stat. 2183], in promulgating the Franchise Rule. In the second place, the Court finds that 16 CFR 436.2 clearly delineates the businesses covered by the Franchise Rule.

sion on a former date. Upon review of the briefs and arguments of counsel, the record, the evidence, and the applicable law, the Court DENIES the defendants' motion to dismiss.

The Court now issues these written findings of fact and conclusions of law on the main demand in accordance with FRCP 52 and its reasons for denying the defendants' later motion to dismiss.

## FINDINGS OF FACT

### 1

Defendant NBC is a Louisiana corporation with its principal place of business in Metairie, Louisiana. It is in the business of selling management services. Defendant Namer is a resident of Metairie, Louisiana and the president, chief executive officer, director and sole shareholder of NBC. At all times relevant to this lawsuit, both NBC and Namer transacted and did business in the Eastern District of Louisiana.

### 2

NBC advertises in trade journals and national periodicals such as *The Wall Street Journal* and *USA Today*. Namer and others at NBC mail literature to, place telephone calls to, and receive telephone calls from prospective consultants who are in states other than Louisiana. (Defendants' Exhibits 84–3 through 84–8.) At all times pertinent to this lawsuit, Namer and NBC used the ad name "Mark Simon" in their classifieds to identify the source of the response when a prospective consultant was to call or write. (Plaintiff's Exhibits 89B and 114.) The fictional name Mark Simon, however, also appeared as an executive of NBC on its stationery. (Plaintiff's Exhibit 16.) Namer also used a fictional identity, telling prospective consultants both by telephone and in person that he was "Robert Behar", an associate consultant with NBC.

### 3

Namer and others at NBC tell prospective consultants that NBC is a large national consulting firm with national accounts, looking for people with business expertise in a particular geographical area. Prospective consultants were also told that NBC required that its associate consultants and sales consultants meet certain qualifications. (Defendants' Exhibit 84–8.)

### 4

Once approved, an associate consultant applicant had to travel to NBC's home office in Metairie, Louisiana for five days of training, which training usually began on Monday morning and ended on Friday afternoon. Sales consultants attended only a two-day training program.

### 5

The associate consultants were required to pay NBC a performance deposit or bond of $7,500; the bond to be paid by the sales consultants came to $750. These deposits were tendered generally by cashier's checks, certified checks or personal checks. Some prospective associate and sales consultants sent their deposits to NBC through the U.S. mail from states outside Louisiana. The performance bond was paid before the initial training period concluded. (Plaintiff's Exhibit 89C.)

### 6

All consultants were required to sign a contract with NBC on the first day of the training session. (Plaintiff's Exhibits 88A, 89E, 90A, and 92D.) On the last day of the training seminar, the contracts were returned to the associate consultants, signed by NBC. At that time, the consultants were asked to "reaffirm", by initialing the contract. *Id.* It was also on the last afternoon of the training session that Namer revealed that he was not Robert Behar, associate consultant, but rather Robert Namer, NBC president.

### 7

Under the terms of the contract, the $7500 performance deposit was to be returned to the associate consultant if he or she earned $50,000 for NBC within one hundred and eighty (180) days. The one hundred and eighty (180) day contract could be extended if a consultant did not earn $50,000 within that period of time. (Defendants' Exhibits 46–5 through 46–8 and 53–9.)

8

During training, NBC provided the consultants with printed materials containing its policies and procedures to which the consultants were required to adhere. An associate consultant received five volumes of printed material entitled (1) NBC Policies and Procedures Forms and Contract, (2) NBC Structured PA and Unstructured PA, (3) NBC Project Outlines One through Ten, (4) Business Valuation Personal Financial Planning Market Audit Market Survey Loan Preparation and Presentation, and (5) NBC Sales Consultant Manual. (Defendants' Exhibits 83-1 through 83-5.) None of the printed materials distributed to the prospective consultants contained any of the disclosure statements required in the FTC regulation entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the Franchise Rule), 16 CFR 436 (Dec. 21, 1978).

9

NBC permitted associate consultants to generate clients through the use of sales consultants. However, associate consultants had to follow NBC standards when advertising for sales consultants. NBC gave them examples of the types of ads and verbiage to use. Furthermore, NBC personnel were made available to assist associate consultants in hiring sales consultants. Bobby Price, an associate consultant, testified that Hugh Youngblood, the Director of Special Support Services and/or Regional Marketing Director for NBC, put on a two-day sales recruitment presentation in Wisconsin in return for a *per diem* allowance plus expenses. (Plaintiff's Exhibit 68B. See also Defendants' Exhibits 53-13 and 83-1.)

10

Once back in their home states, associate and sales consultants operated under NBC's name, logo, and mark (advertising or commercial symbol) and used brochures, literature, forms, and stationary containing NBC's name, logo and mark. (Defendants' Exhibits 39-9, 53-2 and 83-1.)

11

The home office furnished consultants with questionaires which formed the basis of the client's preliminary analysis ["PA"]. (Defendants' Exhibit 83-1.) The associate consultant got the answers from the client, made on-site observations, and forwarded the information to the home office. (Defendants' Exhibit 83-2.) A home office consultant then formulated a PA, from information generated from NBC's home office computer. The computer software was not available to the associate consultants and sales consultants. (Testimony of Gregory Cross, an NBC associate consultant.)

12

Michon Agudo, a former NBC secretary, testified that when an associate consultant returned the PA questionnaire to the home office, she selected specific numbered paragraphs from the computer and printed out a draft. The draft was reviewed and revised several times by Hugh Garner with the home office and then sent back to the consultant in the field.

13

NBC distributes a newsletter regularly to its associate and sales consultants and conducts in-service training for them. (Defendants' Exhibits 59-1 through 59-36, 60-1 through 60-33, 61-1 through 61-27, 62-1 through 62-5, 62-9 through 62-11 and Plaintiff's Exhibit 68B.)

14

Based upon the weight of the credible evidence, the Court finds that NBC was engaged in the franchise business and that its sales are subject to the Franchise Rule, 15 U.S.C. § 53 *et seq.* In this case, the weight of the credible evidence adduced at trial established that Namer granted or promised the right to distribute business consulting services under the advertising and commercial symbols of NBC, and that NBC and Namer had the right to exert significant control over the consultant's method of operation and promised to provide significant assistance to the consultants. The evidence at trial also established that the consultants were required to

pay at least $500 before beginning their relationship with NBC and Namer.

Additionally, the Court finds that defendants knowingly violated the Rule by material misrepresentations or by material omissions in selling its product. Specifically, the Court finds that defendants NBC and Namer did misrepresent and did omit information in the following areas: the number and type of potential clients, the relationship between NBC and its business and personal references, the rate of return of the performance deposit, the number of states in which NBC transacted business, geographic exclusivity, the role sales would play in an associate consultant's job, and pending litigation in which NBC and Namer were involved. Trial testimony established that these areas of misrepresentation and omission were material.

Prospective consultants were led to believe that NBC was a large national consulting firm with national accounts such as Arthur Andersen and Boeing. William H. Sprout, who attended an associate consultant's training session in 1987, testified that he was told that NBC was negotiating with Boeing and Radio Shack/Tandy Corporation. Julie Zavithanos, who was Namer's Executive Assistant in 1988 and early 1989, testified that she heard Namer tell a class of associates that Arthur Andersen was a major client of NBC. However, no evidence was ever presented to substantiate these representations.

The Court finds that defendants offered bogus references to prospective clients. When prospective associate consultants asked for professional references, NBC gave them the name of American Management Consultant Association ["AMCA"] which NBC painted as a separate and independent organization. (Plaintiff's Exhibit 69C.) AMCA was nothing more than a sham corporation, used solely as a reference for NBC. Testimony at trial established that the officers and directors of AMCA were NBC personnel and Robert

Namer was AMCA's Chairman of the Board. (Plaintiff's Exhibit 10.) Pamela Ledet, a former NBC employee and bookkeeper, testified that AMCA had no payroll and no employees. Although its address differed from that of NBC, it was merely a mail pick up. AMCA's telephone rang at NBC's offices and was answered by NBC personnel. Ledet further testified that NBC paid AMCA's telephone bill from NBC's operational budget and, as NBC's bookkeeper, she kept the financial books and records for AMCA and that the checking account for AMCA was under $25.00. Michon Agudo and Dawn Layus, former NBC secretaries, testified that they answered all incoming telephone lines and that Robert Namer told them not to let associate consultants know that AMCA and NBC were related. (Plaintiff's Exhibit 69C.) Paul Joseph Daigre, Sr., Human Resources Director for NBC, testified that when he answered the AMCA phone he identified himself as Paul Dodge so callers would not know that they were talking to NBC personnel and would not know that AMCA was affiliated with NBC.

Some prospective consultants asked for the names of associate consultants and sales consultants whom they might contact for information and/or references. The evidence revealed that NBC provided to them a list of two or three associate consultants who had agreed to serve on what Namer called "jury duty". (Plaintiff's Exhibit 69C and 90B.) Derwin Taylor Lamb testified that when he was on "jury duty", his name was used as a reference by defendants; that he was paid for the time spent in answering these calls; that he averaged about six to eight calls a month for which he received one hundred dollars ($100) per month, and further, that prospective consultants were not told that these references were paid to serve on "jury duty". William Sprout testified that, after speaking with the references, he decided to go to New Orleans. Paul Joseph Daigre, Jr., NBC's Human Resources Director charged with recruiting associate consultants, testified that Namer told him to give out only selected names when prospects asked for refer-

ences and that he was to say that all assignments were made from the home office. Furthermore, Daigre testified that prospective consultants were told that all support services were provided by the home office; they only needed "pencil and paper" to get started.

19

Although defendants told their prospective consultants that their $7500 performance deposit would be returned as soon as the consultant earned $50,000, they failed to tell them that very few ever obtained a partial refund of their performance deposits, and that fewer still ever obtained a full refund because few associate consultants ever realized $50,000 in annual earnings for NBC. William Sprout testified that Namer told him that 93.6% of the trainees earned back their deposits. These omissions were material. The evidence revealed that during the entire time of NBC's existence only two consultants (Ellison and Southwell) generated the $50,000 in earnings for NBC. (See testimony of Pam Ledet, NBC's former bookkeeper). The evidence also revealed that even though NBC has refunded portions of performance deposits to some associate and sales consultants, such a refund was conditioned on the associate or sales consultant's signing a letter stating that NBC had satisfied all its obligations to him.

20

The evidence further revealed that defendants knowingly misrepresented to prospective associates that NBC was authorized to do business in all fifty (50) states. David R. Ellis, a resident of Seattle, testified that he attended the training session in September of 1987 and, before he signed the contract as an associate consultant [Plaintiff's Exhibit 90A] advised Namer that he wanted to work in the state of Washington. He returned home after training, hired three sales consultants, and in October of 1988, he learned that NBC was under a court order to cease and desist from selling unregistered franchises in the state of Washington. (Plaintiff's Exhibit 90C.) Ellis ceased operations and immedi-

ately contacted Namer who suggested only that he move elsewhere to conduct business. Bobby Price testified that he asked Namer if NBC was licensed to do business in Wisconsin; he was specifically told by Namer that NBC was licensed in all states. After he returned home, he bought office equipment and then discovered NBC was not registered to do business in Wisconsin. When Price complained, Namer told him that his contract with NBC did not specify that he was only to work in Wisconsin. When Price requested a refund of his $7500, Namer told him "no way". (See Plaintiff's Exhibits 66D, 66E and 66F.) William Martin, who lives in Sarasota, Florida, attended a session in September, 1988. He testified that after completing his training he discovered that NBC was not registered to do business in Florida, and that the NBC logo was unavailable for his use, having already been registered by another company. (Plaintiff's Exhibit 92F.) The Court finds that NBC and Namer had a positive duty to know in which states it could do business and, if it was prohibited from doing business in a particular state to so advise an applicant before accepting his money. Defendants' failure to do so constituted a material omission under the law.

21

The contract is silent about exclusivity. However, based upon the weight of credible evidence, the Court finds that defendants knowingly made oral misrepresentations to prospective consultants that they would have exclusive territorial rights. Michon Agudo, a former NBC secretary, testified that she was told to tell prospective consultants who inquired, that their "area" was a fifty (50) mile radius. (See also Plaintiff's Exhibit 69C.) Namer testified that the first or senior consultant in an area had the right of first refusal. (See also Defendants' Exhibit 83-1.) William Martin testified that his primary consideration for signing with NBC was that he would be the first NBC consultant in his area. (Plaintiff's Exhibits 92A, 92F, 92H.) Namer and NBC assured him that he would be the only associate consultant on the West Coast of Florida and that the nearest NBC associate consultant in Flor-

ida was located in Orlando. (Plaintiff's Exhibit 92H.) When Martin returned to Florida, he ran ads and interviewed people for a sales consultant job only to discover that there was an NBC consultant in Venice, Florida, which was only about ten miles away from his Sarasota home. (Plaintiff's Exhibit 92G.) Bobby Price testified that NBC told him it was only looking for one person in his area, but he later discovered there was another NBC consultant in his area. FTC witness Frank W. Scharite, who lives in Augusta, Georgia, attended a training session from December 8, 1985, to December 13, 1985. He testified that he was led to believe that he would be the only NBC associate consultant in the Augusta, Georgia area. Failure to advise Martin and Price that there were NBC consultants already in their territory was a material omission.

22

Witnesses testified that during their training they told NBC they did not want to sell and were repeatedly assured by Namer and others at NBC that they would not have to market or sell their services and NBC would refer clients to them. Although, as Namer contends, Sections Nine and Ten of the Policies and Procedures Manual clearly demonstrate that consultants did have to market their services, the credible evidence is that these sections of the Manual were not made available to the trainees until the last day of the session. Richard Wingate, who attended the June 29, 1988, session, and Bobby Price testified that Namer repeatedly told them that they would not have to sell their services. (See also Plaintiff's Exhibits 88E and 89E.) Sprout testified that Mike Newman told him that NBC was going to hire sales consultants to sell his services. Wingate testified he did not receive all of the Policies and Procedures Manual during training because he had been told that some sections were still "in typing" and that he only received Section Ten on Friday, the last day of training. He also testified that he was not able to read Sections Nine and Ten until after training concluded. His testimo-

ny was corroborated by Julie Zavithanos who testified that it was her job to set up the training room each morning, that she had been told by Namer or NBC to leave Sections Nine and Ten out of the written materials and further that the consultants did not receive these materials until late Friday.

23

Namer made a point of telling prospective consultants that NBC had never been sued by a client. However he failed to tell them that complaints had been filed against NBC with the Better Business Bureau, that several former associate consultants had filed civil lawsuits against NBC [Plaintiff's Exhibit 78A], that NBC had sued former associate consultants who had filed complaints with the Better Business Bureau and/or sought refunds from NBC [Plaintiff's Exhibit 98E], and that NBC had been ordered to cease and desist from selling unregistered franchises in the states of Washington and California. (Plaintiff's Exhibits 74B, 75 and 76A.)

24

Witness Frank W. Scharite testified that NBC and Namer promised him an experienced sales consultant in the field. When no such consultant was provided, he requested a refund. (Plaintiff's Exhibits 95C and 95H.) Receiving none, Scharite filed a complaint against the defendants with the Better Business Bureau. In turn, the defendants sued him. His deposit has never been refunded.

25

Defendants offered the testimony of consultants, who for the most part appeared pleased with their training and who testified they had not been given income projections or hints of exclusive geographic territories in their training. However, not one of these defense witnesses attended the same training sessions as the FTC witnesses. Moreover, even Derwin Taylor Lamb, who testified for defendants, admitted on cross examination that at the time he signed his contract with NBC, he was under the impression that NBC would provide him with clients and he would not have to sell his services. It was only later that he

came to understand that he would have to get his own clients. Lamb also admitted that neither Namer nor NBC had provided him with financial data on the company or with a list of consultants.

26

At the conclusion of the five day training course, each associate consultant completed an evaluation form. (Defendants' Exhibit 6–4; Plaintiff's Exhibit 96H.) Although these forms indicate that the trainees were well pleased with NBC's performance, live testimony was to the contrary. William Martin testified that Namer refused to accept an unfavorable form. (Plaintiff's Exhibit 92E.) Martin testified that it took three attempts for him to complete an evaluation that was acceptable to Namer. The first two were rejected because they contained negative answers. It was only when he filled out the evaluation with qualified affirmative answers to all questions that Namer allowed him to turn it in. (Defendants' Exhibit 13–3.)

## CONCLUSIONS OF LAW

1

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1337(a), 1345 and 15 U.S.C. §§ 53(b) and 57(b) [57b(b)].

2

Venue in the Eastern District of Louisiana is proper under 28 U.S.C. § 1391(b) and (c), and under 15 U.S.C. § 53(b).

3

Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), provides in pertinent part: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

4

NBC advertises in national periodicals. Namer and others at NBC mail literature to, place telephone calls to, and receive telephone calls from prospective consultants who are in states other than Louisiana and therefore defendants' actions are in or affecting commerce under Section 5(a)(1) of the FTC Act.

5

The FTC is the proper party plaintiff. It is an independent agency of the United States government created by statute. 15 U.S.C. §§ 41–58. Section 5(a)(2) of the FTC Act, 15 U.S.C. § 45(a)(2), charges the Commission with enforcement of Section 5(a)(1) of the FTC Act.

6

The Court may issue a permanent injunction to restrain violations of the FTC Act. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). Permanent injunctive relief under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), is appropriate against conduct that clearly violates Section 5(a)(1) of the FTC Act. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1086–1087 (9th Cir.1985).

## THE FRANCHISE RULE

7

The Franchise Rule defines with specificity acts or practices which are unfair or deceptive. Violations of the Franchise Rule are actionable under Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b. *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1109–111 (9th Cir.1982).

8

In order to prove a violation of the Franchise Rule, the government must show that the defendants' sales are subject to the rule, that the defendants violated the rule and that the violation was made knowingly. *United States v. Technical Communications Industries, Inc., et al.*, 1986–2 Trade Cases ¶ 67,388 at p. 62,060, 1986 WL 15489 (December 22, 1986).

9

The defendants' sales are subject to the Franchise Rule if (1) the franchisee grants or promises the right to distribute goods or services which bear the franchisor's trademark, trade name, advertising or other commercial symbol, 16 CFR 436.-2(a)(1)(i)(A)(1); (2) the franchisor exerts or

has the right to exert significant control over the franchisee's method of operation or the franchisor promises to provide the franchisee significant assistance in the franchisee's operation, 16 CFR 436.-2(a)(1)(i)(B)(1) and (2); and (3) as a condition to obtain or begin the franchise relationship, the franchisee must pay or commits to pay at least $500 to the franchisor or the franchisor's affiliate at any time before or within six months after the franchise business begins, 16 CFR 436.2(a)(2) and (3)(iii). *Id.*

The Commission has interpreted the requirement of a payment under the Franchise Rule to include all sources of revenue, including deposits. Statement of Basis and Purpose, 43 Fed.Reg. 59614, 59703 and n. 52 (December 21, 1978); Final Interpretive Guides, 44 Fed.Reg. 49966, 49967 (August 24, 1979).

An agency's interpretation of its own regulations is entitled to great weight and deference. *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *PPG Industries, Inc. v. Harrison*, 660 F.2d 628, 633 (5th Cir.1981).

The Court finds as a matter of law that the NBC and Namer have been engaged in the sale of business opportunities and that these opportunities are franchises, as "franchises" is defined in Section 436.2(a) of the Franchise Rule, 16 CFR 436.

Defendants NBC and Namer do not fall within any of the exceptions to the Franchise Rule.

The Franchise Rule requires that the franchisor provide prospective franchisees with a basic disclosure document, at least ten business days prior to entry of a contract or payment of money or at the first personal meeting, whichever is earlier. 16 CFR 436.1, 436.2(g). NBC and Namer have not made the disclosures required by the Franchise Rule and accordingly the Court finds that NBC and Namer have violated 16 CFR 436.1(a-d).

## SECTION FIVE OF THE FTC ACT

An act or practice is deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45(a), if there is a "representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances, and the representation, omission, or practice is material...." *Cliffdale Associates, Inc., et al.*, 103 FTC 110, 164–165 (1984). *See also Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1435 (9th Cir.1986).

Deceptions relate to material matters when they were likely to affect the consumer's decision whether to purchase the defendants' services. *United States v. Technical Communications Industries, Inc., et al., supra* at p. 62,061; *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291–1292 (D.C.Minn.1985).

In order to attach individual liability for corporate unfair or deceptive practices, the Commission must show that the individual knew the corporation was engaged in dishonest or fraudulent conduct. *Id.* and the cases cited therein.

The Commission may prove knowledge of the dishonest or fraudulent conduct by showing actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. *FTC v. International Diamond Corp.*, 1983–2 Trade Cases ¶ 65,-725 at p. 69,705 (November 8, 1983).

The Commission must also show that the defendants directly participated in acts or had authority to control the conduct of the corporation. The authority to control means active involvement with business matters and corporate policy. *Kitco, supra; Accord United States v. Johnson,*

541 F.2d 710 (8th Cir.1976) [The organizer, sole stockholder, chief executive was responsible for establishing policy and directing the operations of corporation. "When he acted, the corporation acted." Individual liability attached. *Id.* at 712–13.]

Proof of the intent to deceive is not a prerequisite to finding a violation of Section 5 of the FTC Act. "Deception may be accomplished by innuendo rather than by outright false statements.... [I]t is sufficient that deception is possible." *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3rd Cir. 1963).

"A company that deceives consumers through reckless even simply negligent disregard of the truth may do just as much harm as one that deceives consumers knowingly." *Sears Roebuck & Co. v. FTC,* 95 FTC 406, 517, n. 9 (1980).

Individual liability for violations of Section 5 can be predicated either on (1) an individual's having had a role in directing, controlling or formulating the practices and policies of the corporate defendant, *United States v. Johnson,* 541 F.2d 710, 712–713 (8th Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1106, 51 L.Ed.2d 539 (1977); (2) an individual with authority to direct or control employees failing to exercise that control to prevent violations of Section 5; or (3) an individual's having placed in the hands of others the means of consummating a fraud. *Regina Corp.,* 322 F.2d at 768, and the cases cited therein.

The Court finds that the defendants NBC and Namer have participated in unfair and deceptive trade practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), through a series of material misrepresentations and omissions.

For the foregoing reasons and those orally assigned at the conclusion of trial, the Court finds grounds for granting the permanent injunction and continuing the asset freeze until damages are determined. Let judgment be entered accordingly.

## MOTION TO DISMISS

After trial had been concluded, defendants filed a motion to dismiss the lawsuit with prejudice because the FTC allegedly had not shown that it had the requisite clean hands to bring this action in equity. The defendants alleged that the FTC had acted with bad faith and in violation of its own rules.

In response, the FTC argued that the equitable doctrine of unclean hands was not applicable to a proceeding brought to protect the public interest; and even were the doctrine applicable, defendants' allegations did not support its application in this case.

After considering the briefs and arguments of counsel, the record and the applicable law, the court finds that the defendants' motion to dismiss lacks merit and IS DENIED for the following reasons, to wit:

Although the United States is subject to general principles of equity when seeking an equitable remedy [*USA v. Willson, et al.,* 707 F.2d 304 (8th Cir.1983) citing *Pan American Petroleum & Transport Co. v. United States,* 273 U.S. 456, 506, 47 S.Ct. 416, 424, 71 L.Ed. 734 (1927); *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 339, 26 S.Ct. 282, 288, 50 L.Ed. 499 (1906); *United States v. Second National Bank of North Miami,* 502 F.2d 535, 548 (5th Cir.1974)], equitable principles may not be used to frustrate federal law or "to thwart public policy." 502 F.2d at 548. *See also SEC v. Gulf & Western Industries, Inc.,* 502 F.Supp. 343, 348 (D.D.C.1980) [The doctrine of clean hands was "clearly without merit [against the SEC] because it may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest."] Furthermore, "unless the Government did something which in good conscience it should not have done, or failed to do something fair dealing required it to do, it comes into court with clean hands and in entitled to the equitable relief it obtained." 502 F.2d at 348. In

this case, the Court finds no evidence that the FTC either did something that it should not have done in good conscience or failed to do something that "fair dealing" required it to do.

The defendants attack first the FTC investigation itself as evidence of the FTC's lack of good faith, finding fault with the questionnaire, its length, its composition and the fact that they were not contacted before its mailing. The defendants complain that the FTC investigator refused, based on privilege, to disclose the contents of the recommendation made to the Commission after the investigation. The defendants also complain that the affidavits attached to the Motion for TRO and Asset Freeze were of disgruntled associate and sales consultants. The defendants fail to state that they, with advice of counsel, clearly consented to the issuance of the preliminary injunction and asset freeze when the matter first came on for hearing. The defendants also complain of the scope of discovery sought by the FTC. Having reviewed the record and the evidence submitted, the Court finds no proof of wrongdoing on the part of the FTC in its investigation.

Secondly, the defendants complain that an FTC lawyer contacted three of defendants' witnesses during trial. That issue was raised and resolved at trial against the defendants.

Defendants then point to portions of the FTC Operating Manual and internal rules as evidence of FTC's misconduct. The Court finds that the provisions of the FTC Operating Manual are not binding, being couched in discretionary terms. The manual's overview itself states that the Operating Manual is "advisory and instructional" ... "nor does it serve as a basis for nullifying any action of the Commission or the staff." Defendants' Ex. 28, .1 THE OPERATING MANUAL, .1.1 FUNCTION AND AUTHORITY. Therefore the Court need not decide whether or not the FTC followed its Operating Manual. *Cf., Schweiker v. Hansen*, 450 U.S. 785, 789–790, 101 S.Ct. 1468, 1471–1472, 67 L.Ed.2d 685 (1981) [manual used by Social Security Administration staff "has no legal force" and "does not bind the SSA."]; *Einhorn v. Dewitt*, 618 F.2d 347 (5th Cir.1980) [The court refused to enjoin an IRS action because the regulation on which taxpayer relied was discretionary.] The defendants argue that the FTC failed to follow its own rules because it filed a district court action seeking a permanent injunction rather than an administrative complaint seeking a cease and desist order. The Court finds that the FTC is not required to file an administrative complaint. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), contains a final clause that empowers the FTC to seek a permanent injunction in federal district court. Once a plaintiff establishes an equitable cause of action, the district court may use its full equitable powers to grant appropriate preliminary relief. *See also Federal Trade Commission v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111–13 (9th Cir.1982); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir.1984); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir.1988).

Finally, defendants say the FTC violated 5 U.S.C. § 554(c). However, the earlier part of that same statute, 5 U.S.C. § 554(a), provides that 5 U.S.C. § 554(c) is only applicable when an agency proceeds administratively, rather than through the court system. In this instance, FTC did not seek administrative relief; accordingly, the Court finds that 5 U.S.C. § 554(c) is clearly inapplicable.

In summary, then, the Court finds that the FTC actions were within its authority, and that the FTC came to court with clean hands.

Let judgment be entered accordingly.

New Orleans, Louisiana, this 19th day of March, 1990.

/s/ Veronica D. Wicker  
VERONICA D. WICKER  
UNITED STATES DISTRICT JUDGE