**FEDERAL TRADE COMMISSION,**
Plaintiff,

v.

Scott **WILCOX, et al., Defendant.**

No. 93–6913–CIV–FERGUSON.

United States District Court,
S.D. Florida.

Sept. 29, 1995.

. Gerald B. Wald, Gerald B. Wald, Receiver, Miami, FL, pro se.

Samuel J. Flanagan, United States Attorney's Office, Fort Lauderdale, FL, for F.T.C.

Sheridan K. Weissenborn, Papy & Weissenborn, P.A., Coral Gables, FL, Frank J. Shannon, III, Atlanta, GA, for Scott Wilcox, Linda Wilcox and Direct Response, Inc.

*ORDER AFFIRMING MAGISTRATE'S REPORT AND RECOMMENDATION*

FERGUSON, District Judge.

**THIS CAUSE** is before the Court on Plaintiff's Motion for Summary Judgment (D.E. 102) and Defendants' Motion for Summary Judgment (D.E. 114).

**THE MATTER** was referred to the Honorable Barry S. Seltzer, United States Magistrate Judge. A Report and Recommendation dated September 7, 1995 has been filed, recommending the following:

1. That Plaintiff's Motion for Summary Judgment (D.E. 102) be GRANTED;

2. That Defendants' Motion for Summary Judgment (D.E. 114) be DENIED;

3. That the Court issue a permanent injunction prohibiting the defendants from any involvement, direct or indirect, in the development, marketing, or sale of any promotion by direct mail and from making misrepresentations when they market promotions or sell products or services other than by direct mail;

4. That the Court enter judgment holding the defendants jointly and severally liable for consumer redress in the amount of $22,024,950;

5. That the permanent receiver, Gerald Wald, be directed to liquidate any remaining assets of the receivership defendants, take all appropriate steps to maximize the amount of funds available for consumer redress, formulate a plan for the distribution of assets to consumers for Court approval, and administer the distribution of such assets pursuant to further order of the Court.

The defendants have filed objections to the Report. The Court having reviewed these objections, the pertinent portions of the file, and being otherwise fully advised, it is

**ORDERED AND ADJUDGED** that United States Magistrate Judge Barry S. Seltzer's Report and Recommendation of September 7, 1995 is AFFIRMED and based thereon, Defendants' Objections thereto are OVERRULED. It is further

**ORDERED AND ADJUDGED** that the Report and Recommendation shall be incorporated into a separate Final Judgment and Order for Permanent Injunction.

**DONE AND ORDERED.**

*REPORT AND RECOMMENDATION TO DISTRICT JUDGE*

SELTZER, United States Magistrate Judge.

THIS CAUSE is before the Court upon the Plaintiff's Motion for Summary Judg-

ment (DE 102) and the Defendants' Motion for Summary Judgment (DE 114) and was referred to United States Magistrate Judge Barry S. Seltzer pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida.

## PROCEDURAL HISTORY

The Federal Trade Commission ("FTC") brings this action under § 13(b) of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 53(b), against Scott Wilcox, Linda Wilcox, and Direct Response, Inc. The FTC seeks permanent injunctive relief prohibiting the defendants from engaging in unfair or deceptive acts and practices in violation of § 5(a) of the FTCA, 15 U.S.C. § 45(a). The FTC also seeks such other equitable relief as is necessary to redress the injury to consumers that resulted from the defendants' alleged violations. On November 4, 1993, following an evidentiary hearing[1], the District Court entered an Order for Preliminary Injunction (DE 37), which, *inter alia,* enjoined the defendants from engaging in certain specified acts relating to their direct mail businesses and further prohibited them from selling or transferring their assets. The Court also appointed a permanent receiver to take control of and oversee the defendants' property. The parties have now filed cross-motions for summary judgment.

## SUMMARY JUDGMENT MOTIONS

### 1. *Background*

The FTC alleges that the defendants have engaged in unfair trade practices in connec-

tion with a massive direct mail operation.[2] During a three year period, the defendants, working under a variety of trade names, mailed to consumers at least 50 million solicitations (Answer, ¶ 10, 18; Admissions[3] No. 82, 91, 92; FTC Ex. 56 at 002118); in a 14 month period alone, the defendants sent more than 35 million pieces of mail at of cost of more than $7 million (Tr. 41). The response to these solicitations was tremendous; the defendants received hundreds of thousands of pieces of mail, averaging on each day eighteen U.S. Postal Service mail tubs filled with letters one and a half feet high. (G. Wrye Dep. 29; Tr. 35–36).

The defendants' solicitations to consumers fell into two general categories: "holding money" and "guaranteed award" promotions. The "holding money" solicitations represented that the defendants were holding a significant amount of money (typically between $4,500 and $5,178) to which the consumer was entitled. The solicitations stated that the consumers would forfeit the money unless they immediately sent a claiming fee (always under $20) to one of the defendants' companies. The names of the companies that were listed in the promotions implied that the sponsors were in the business of distributing money: Bureau of Cash Rewards (FTC Ex. 11); Center for Refund Services (FTC Ex. 12, 13); Sweepstakes Control Bureau (FTC Ex. 14–16); Unawarded Cash Bureau (FTC Ex. 17); and, Un-

---

1. At the preliminary injunction hearing, the FTC submitted three volumes of exhibits, including declarations from sixty-five consumers, copies of defendants' mailings, documents from the defendants' business premises, and affidavits from law enforcement officials. The FTC also presented testimony from two former employees, a postal service inspector, and an FTC investigator. Neither the defendants nor their attorney appeared at the hearing. References to the transcript of the hearing (FTC Ex. 72) are designated by "Tr." followed by the page number.

2. In addition to mailing solicitations, the defendants allegedly engaged in a variety of related activities: selling the names of the consumers who responded to their solicitations to various list brokers (Admission No. 84; Tr. 11); selling consumer response cards to a company that pur-

chased leads (Tr. 10–11); conducting a direct mail film processing business as part of several of their promotions (G. Wrye Dep. 10–11, 15–16); and, teaching others their deceptive techniques, both in person and through "get rich quick" promotions. (Hare Dep. 32, Taylor Dep. 43; G. Wrye Dep. 47; Tr. 7, 35–37; FTC Ex. 56).

3. Plaintiff served its First Set of Requests for Admissions on defendants on October 26, 1993. Defendants filed a motion to extend the time within which to respond, which the Court denied on December 29, 1993. Defendants have never answered or responded to the requests. Therefore, under Fed.R.Civ.P. 36(a), all matters in the Requests for Admissions are deemed admitted. The Request for Admissions are filed as Exhibit 73 to plaintiff's memorandum in support of it summary judgment motion.

claimed Funds Network (FTC Ex. 18).[4]

The "guaranteed award" solicitations notified customers that they had been selected to receive one or more awards, prizes, or free gifts. The solicitations described these items as "valuable," "fabulous," or "choice" and identified such items as automobiles, cameras, video equipment, and large amounts of cash. To claim the award, the consumer was required to send a fee, always under $20. As with the "holding money" solicitations, the names of the "guaranteed award" sponsors suggested that they were in the business of distributing awards: Award Notification Center (FTC Ex. 20); Gift Claim Center (FTC Ex. 25); Winners Claim Dispatch (FTC Ex. 26–27); and, Official Winner (FTC Ex. 28).[5]

### 2. Standard of Review

■ Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law...." An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it must be decided in order to resolve the substantive claim or defense to which the motion is directed. *Id.*; *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993).

■ The burden is on the moving party to establish the absence of a genuine issue as to any material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the movant has satisfied its initial burden, the nonmoving party must then go beyond the pleadings to rebut any facts properly presented; it may do so through affidavits or other evi-

---

4. The FTC describes a typical "holding money" promotion of the defendants—the Center for Refund Services' solicitation (FTC Ex 12):

> The postcard states that the Center has money belonging to the consumer and implies that the sum is substantial. Large type announces a "Notice of Cash Disbursement" and the maximum amount of the check appears to be written by hand as $5178. The front of the card announces that "[t]his office is holding your check from 1991," and the back identifies the card as a public notice about 1991 tax refund checks. The card also states that consumers can claim their refund by mailing $9.97 to defendants.
>
> Various phrases represent that the notice is "official." Immediately below the sender's name and address appear the words **PUBLIC NOTICE** in capital letters that are underlined. At the top of the reverse side, "Public Notice" appears again in large, bold print, and below that, "Taxpayer Information. This is a *Public Notice* that the U.S. Government is holding unclaimed tax refund checks for tax year 1991." In addition, the postcard explains "This is a required notice...."

Memorandum in Support of Plaintiff's Motion for Summary Judgment (DE 103, p. 6). Some of the consumers were also sent a "Second Final Notice to Taxpayer," containing many of the representations made in the initial notice. (FTC Ex. 120, 122, 123, 127, 129, 134, 135, 136, 164, 165).

5. The FTC describes the defendants' Consumer Survey Division solicitations (FTC Ex. 21, 22) and the $300,000 Bonanza solicitations (FTC Ex. 19) as illustrative of "guaranteed award" promotions:

> The Consumer Survey Division solicitations promise the consumer cash and awards in exchange for participating in future television surveys and/or answering a few questions about viewing habits. The envelope represents that the consumer can "get paid cash over and over again to watch T.V.!" The enclosed letter, signed by L.S. Wilcox, promises consumers a "nice check" and two or more "fabulous" prizes for answering several questions about their viewing habits and correctly identifying Johnny Carson's co-host. Many of the specified prizes have high retail value, such as a Cadillac, a Sony Big Screen TV, an Apple Computer, a Kenmore Refrigerator, and a $750 CASH PLUS Kodak Film Package. Other prizes, such as the Food Processor, appear somewhat less valuable, but still worth more than the entry fee of $15. One of the prizes is $2000 in cash.
>
> The $300,000 Bonanza solicitation announces the consumer's selection for "second place," entitling the recipient to receive one of five "valuable" items (Home Exerciser Set, 35mm Camera with Carrying Strap and Case, Compact Sewing Machine, Ultimate Touch Tone Phone, Cuisine Food Processor) and an extra free gift (Quartz Wrist Watch, Deluxe Binoculars, 250 Rolls of Kodak Film). The consumer must send a "mail processing fee" of $14.90 and the notice promises that there is no further obligation.

dence showing the existence of genuine issues of material fact for trial. Fed.R.Civ.P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Adickes*, 398 U.S. at 160, 90 S.Ct. at 1610; *Hairston*, 9 F.3d at 918.

■ In considering the motion, the Court must construe the evidence and the inferences drawn from the underlying facts in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Furthermore, facts asserted by the party opposing a summary judgment motion must be regarded as true if supported by affidavit or other evidentiary material. *Coke v. General Adjustment Bureau*, 640 F.2d 584, 595 (5th Cir.1981) (quoting 10 C. Wright and A. Miller, *Federal Practice and Procedure*, § 2727 at 524–30 (1973)).

### 3. *Legal Standards and Analysis*

■ Section 5(a) of the FTCA declares unlawful "unfair or deceptive acts or practices in or affecting commerce,"[6] and the statute empowers the FTC to prevent such acts or practices. 15 U.S.C. § 45(a)(1) and (2). To establish that an act or practice is deceptive, the FTC must show that the defendants made a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances. *FTC v. Atlantex Assocs.*, 1987–2 Trade Cas. (CCH) ¶ 67,788 at 59,252, 1987 WL 20384 (S.D.Fla.1987), *aff'd*, 872 F.2d 966 (11th Cir. 1989). *See also FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988); *Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1436 (9th Cir.), *cert. denied*, 479 U.S. 828, 107 S.Ct. 109, 93 L.Ed.2d 58 (1986); *FTC v. Patriot Alcohol Testers, Inc.*, 798 F.Supp. 851, 855 (D.Mass.1992). Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material. *Thompson Medical Co., Inc. v. FTC*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987);

*FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1291 (D.Minn.1985). Explicit deception is not necessary to a finding of violation under § 5(a). "Deception may be accomplished by innuendo rather than by outright false statements.... [I]t is sufficient that deception is possible." *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3rd Cir.1963).

■ The evidence submitted by the FTC amply demonstrates that the defendants' express and implied representations about both the nature of the solicitations and the cash and awards to be received created a false or misleading impression on the part of consumers that they could claim substantial sums of money or valuable merchandise merely by forwarding a small fee to the defendants. In sworn declarations submitted by the FTC, consumers expressed their understanding that they had an income tax refund being held for them by the defendants (FTC Ex. 125, 127, 131, 136), that they had won a sweepstakes (FTC Ex. 120, 124, 128, 132, 133, 164), or that they would receive a product or cash worth more than the fee required to claim their award (FTC Ex. 104, 106, 107, 109, 146.) In actuality, however, consumers who responded to the solicitations received little or nothing in return. Testimony presented at the preliminary injunction hearing established that approximately 40,000 consumers responding to the Center for Refund Services promotion failed to receive anything at all (Tr. 20–21, 28); of the 20 consumer declarants responding to this promotion, 17 received absolutely nothing in return (FTC Ex. 120–125, 127–134, 137, 164–165) and 2 received a 13–page booklet explaining how to apply for IRS refunds (FTC Ex. 126, 135). In some instances, consumers responding to the "holding money" promotions received a check for either $.50 or $1.00 in return for their fee; however, in one such promotion, more than 600,000 consumers never received even these small checks (Tr. 28).

Similarly, many consumers who paid the processing fee in response to the "guaranteed award" solicitations never received what had been represented. For example, in the $300,000 Bonanza promotion, 63,000 consum-

---

6. The parties do not dispute that the defendants' solicitations affected commerce.

ers did not receive their prize (Tr. 22–23). And some of the consumers who did receive a prize were sent items of negligible value (FTC Ex. 101–109) or items that were inoperable (FTC Ex. 8). In the same solicitation, the defendants also promised consumers who sent money within 10 days an "extra free gift," identified as "250 rolls of Kodak film with processing." Consumers reasonably understood they would receive 250 rolls of free Kodak film and free processing for these rolls (FTC Ex. 100–110). They received instead a packet of discount coupons for use at a film developing company owned by the Wilcoxes. To receive a free roll of film, consumers had to send a coupon with an exposed roll of film and pay a fee for the film's development (FTC Ex. 100–107). In addition, 225,000 consumers who responded to the "Award Director" promotion and 23,000 consumers who responded to the "Gift Claim Center" promotion received nothing at all in return (Tr. 17–18).

Defendants have failed to produce any evidence showing that their solicitations were not deceptive; they instead argue that the 65 sworn consumer declarations and the 10,000 consumer complaints described by the postal inspector at the preliminary injunction hearing constitute such a small percentage of their total mailings that they are insufficient to prove the solicitations violated the FTCA.

■ A similar argument was rejected by the district judge who ruled upon the deceptiveness of advertisements in *FTC v. US Sales Corp.*, 785 F.Supp. 737 (N.D.Ill.1992). In *US Sales*, the defendant argued that summary judgment should not be granted because the FTC had come forward with only a small sample of consumer complaints. The court, nonetheless, found a violation of § 5(a), explaining:

> [T]he FTC needs only to show that a reasonable consumer, upon hearing the advertisement, likely would be misled to his detriment. In other words, the FTC is only required to show that it is likely, not that it is certain, that a reasonable consumer would be mislead. Accordingly, the FTC does not need to show that every reasonable consumer would be mislead by the advertisements.... Indeed, adver-

tisements are illegal if they have a "tendency" or "capacity" to deceive; actual deception of particular consumers need not be proven.

*Id.* at 748 (citations omitted). Furthermore, even the existence of some satisfied customers would not be a defense to liability. *FTC v. Amy Travel Service*, 875 F.2d 564, 572 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989).

Defendants' other arguments are also without merit. They contend that the evidence presented by the FTC is not relevant because it illustrates the defendants' business practices more than a year before this action was commenced. Defendants argue that they were, in fact, fulfilling their obligations to consumers during 1993. This conclusory statement, however, is contrary to the undisputed facts. Defendants' own employees testified that they continued to fail to fill orders at least up to and including July 1993 (G. Wrye Dep. 30; Kreiger Dep. 32–38) and that consumers complained about non-receipt of items in both 1992 and 1993 (Vera Dep., Ex. 61, 62, Ex. 72 at 58–61).

In a shift of position, the defendants next argue that it was impossible for them to fulfill their consumer obligations because the government seized their records and assets in 1991 and 1992. The evidence, however, reveals that the defendants failed to ship products to consumers even before the 1991 seizure (G. Wrye Dep. 57–58). When the government seized their bank accounts in December 1992, the defendants had been in possession of $328,000 of monies they could have been used to fill consumers' orders up until that time (FTC Ex. G–2, p. 9). Moreover, the defendants continued to engage in direct mail solicitations up until the October 1993 entry of the temporary restraining order in this case. Even after the November 1991 and December 1992 seizures of their bank accounts, the Wilcoxes' continued to start new companies that sold products by mail and that offered to teach others how to use their mail techniques. Between June and September 1993, the Wilcoxes' sent consumers more than 700,000 mail solicitations (FTC Ex. 7, ¶ 20). At the time this Court entered the temporary restraining order, the

defendants were receiving approximately 500 consumer responses a day. (FTC Ex. 6, ¶ 20).

Nor does the defendant's proffer that they refunded monies and reshipped merchandise when consumers complained (Defendants' Ex. J, 63, 92, 93) create a genuine issue of material fact sufficient to defeat summary judgment. The FTC responds that all consumers who paid money in response to the defendants' solicitations, not just those who complained, were deceived because they received, at most, small checks or trinkets instead of the valuable items or significant amounts of cash defendants had promised. The undersigned agrees. Defendants' contentions, even if true, are irrelevant. As the FTC correctly stated, "Whatever care defendants may have shown to soothe some complaining consumers or to reship worthless trinkets does not undo the deception by which the payment was obtained in the first place." (Reply, DE 117, p. 2).

The undersigned finds that the defendants' express representations that they were holding significant amounts of money to which consumers were entitled and that consumers would receive valuable products, free gifts, or substantial sums of cash were patently false. It is beyond dispute that the defendants fostered the impression upon reasonable consumers that by forwarding a small fee they would receive sums of cash or awards and prizes valued in excess of the fee. These representations were material in that they induced consumers to send money to the defendants. It is further beyond dispute that the defendants' representations mislead consumers, as evidenced by the large number of consumers who received either nothing at all or items of only negligible value; but for the misrepresentations, a reasonable consumer would not have sent even a small fee. Accordingly, the undersigned finds that defendants' representations were deceptive under § 5(a) of the FTCA.

### 4. Res Judicata and Collateral Estoppel

The defendants contend that the consent orders entered in four civil forfeiture actions concerning the defendants' bank accounts [7] and an order of dismissal pursuant to a stipulation concerning a postal action revoking the defendants' bulk mail permits [8] resolved all claims and issues between the FTC and the defendants. They argue, therefore, that the doctrines of *res judicata* and collateral estoppel bar this action and entitle them to summary judgment.

The doctrines of *res judicata* (claim preclusion) and collateral estoppel (is-

---

7. The defendants in this action are claimants in the four forfeiture actions:

1) *United States v. $165,292.75 in U.S. Funds, etc.,* United States District Court for the Southern District of Indiana, Case No. IP–92–194–C, filed February 19, 1992. *See* Defendants' Ex. B–1, B–2, B–3, C, I (DE 116).

2) *United States v. $136.61 in U.S. Funds, etc.,* United States District Court for the Western District of Tennessee, Case No. 92–2328–H/A, filed April 10, 1992. *See* Defendants' Ex. D–1, D–2, D–3, (DE 116).

3) *United States v. Funds Deposited in Three (3) Bank Accounts etc.,* United States District Court for the Southern District of Florida, Case No. 92–0536–Civ–Graham, filed March 5, 1992. *See* Defendants' Ex. G–1 (DE 116).

4) *United States v. Funds Seized from Various Bank Accounts, etc.,* United States District Court for the Southern District of Florida, Case No. 93–6369–Civ–Gonzalez, filed May 4, 1993. *See* Defendants' Ex. G–2, (DE 116).

The United States in these *in rem* actions sought orders declaring that 28 bank accounts be forfeited. Prior to any substantive hearing or evaluation of the merits, each of the cases settled.

The four courts approved consent orders of forfeiture whereby approximately 90% of the seized assets were retained by the United States and 10% were transferred to defense counsel or to the Receiver. Each case was then dismissed with prejudice. *See* Defendants Ex. H–1, H–2, H–3 (DE 116 and 143).

8. In December 1992, the U.S. Postmaster at Fort Lauderdale revoked the defendants' bulk mail permits on the ground that the permits were being used in an unlawful scheme; the revocation was upheld by the Postal Service. Scott Wilcox and Direct Response, Inc., the defendants here, subsequently brought an action against the United States and the United States Postal Service, claiming that the revocation of the permits violated their due process rights. *Scott Wilcox d/b/a Adco International, and Direct Response, Inc. v. United States of America and the United States Postal Service,* 93–6271–Civ–Ryskamp. *See* Defendants' Ex. E–1, E–2, F (DE 116). The parties settled, and the case was dismissed with prejudice pursuant to a Stipulation of Dismissal; the permits remained revoked, albeit on different grounds. *See* Defendants' Ex. H–4 (DE 116).

sue preclusion) are employed to prevent litigation of matters of law and fact previously adjudicated; they "promote the conservation of judicial resources by preventing needless litigation." *Refined Sugars Inc. v. Southern Commodity Corp.*, 709 F.Supp. 1117, 1120 (S.D.Fla.1988) (Scott, J.). *"Res judicata"* refers to the "preclusive effect of a judgment in foreclosing relitigation of matters that were litigated or could have been litigated in an earlier suit." *I.A. Durbin, Inc. v. Jefferson National Bank*, 793 F.2d 1541, 1549 (11th Cir.1986). "When [*res judicata* or] claim preclusion does not apply to bar an entire claim or set of claims, the doctrine of collateral estoppel, or issue preclusion, may still prevent the relitigation of particular issues which were actually litigated and decided in a prior suit." *Citibank N.A. v. Data Lease Financial Corp.*, 904 F.2d 1498, 1501 (11th Cir.1990).

■■■ To succeed on the defense of *res judicata*, the defendants must demonstrate that (1) there has been a final judgment on the merits in a prior suit;[9] (2) the decision was rendered by a court of competent jurisdiction;[10] (3) the prior suit involves the same parties or their privies; and, (4) the instant case is based on the same cause of action as the prior suit. *I.A. Durbin*, 793 F.2d at 1549.

■■ Although the first two elements are satisfied here, the third requirement—identical parties or their privies—is lacking. The FTC initiated this action, while the United States was the party involved in the prior actions; therefore, the parties are not identical. Nor is there privity between the United States and the FTC under the facts of this case. Defendants argue to the contrary, relying on *Sunshine Anthracite Coal Co. v.*

*Adkins*, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940). In that case, the Supreme Court stated that as a general rule, "[t]here is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is *res judicata* in relitigation of the same issue between that party and another officer of the government." *Id.* at 402–03, 60 S.Ct. at 916–17. The Court, however, proceeded to state that "[t]he crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy." *Id.* at 403, 60 S.Ct. at 917.

■■ The FTC is not part of the executive branch; it is an independent agency of the government created by statute, *see* 15 U.S.C. §§ 41–58, and charged with the enforcement of the FTCA, 15 U.S.C. § 45(a)(2). Only the FTC can bring § 13(b) actions, unless it authorizes the Attorney General to file on its behalf, which it did not do. Neither the Postal Service in the revocation case nor the Attorney General in the forfeiture cases had the authority to seek injunctive relief or consumer redress under § 13(b). Here different agencies with different functions, interests, and authority sought different relief over different periods of time. Under these circumstances, the FTC should not be considered to be in privity with the United States or the Postal Service. *See FTC v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (Justice Department's prior antitrust suit did not preclude FTC from litigating unfair competition proceeding even though both actions based largely on same conduct);[11] *United States v. Alky Enterprises, Inc.*, 969 F.2d 1309 (1st Cir.1992) (prior

9. A dismissal of a complaint with prejudice entered by stipulation of the parties under Fed. R.Civ.P. 41 satisfies the *res judicata* requirement that there be a final judgment on the merits. *Citibank*, 904 F.2d at 1501–02. The parties do not dispute that this element is satisfied for purposes of *res judicata*. Consent judgments also support the application of *res judicata*, but they generally are not given preclusive effect under the doctrine of collateral estoppel. *See* discussion *infra*.

10. The parties do not dispute that the prior orders were entered by courts of competent jurisdiction.

11. "Section 5 of the Federal Trade Commission Act is designed for independent administration solely in proceedings initiated by the Commission.... [C]laim preclusion would defeat the purposes of seeking independent administrative expertness through Commission proceedings." 18 Wright, Miller & Cooper, *Fed.Prac. and Proc.*, Ch. 13, § 4411, p. 89 (1981) (discussing *Cement Institute* ).

action by ICC for injunctive relief did not bar subsequent action by United States to recover civil penalties for violations of the Interstate Commerce Act; ICC and United States not in privity because ICC could not have sought civil penalties in prior action).

■■■ Furthermore, the defendants in the forfeiture actions were bank accounts, not the Wilcoxes. "A civil forfeiture action is not an action *in personam* against the claimant of the property; rather, it is an action *in rem* against the property itself." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1435 (11th Cir.1991). Similarly, the Postmaster did not proceed against the Wilcoxes personally when revoking the bulk mailing permits.

■■■ Even were the Court to determine that the parties are identical or in privity, the defendants have failed to establish the fourth element for the application of res judicata—same causes of action. "The principal test for determining whether the causes of action are the same is whether the primary right and duty are the same in each case." *I.A. Durbin,* 793 F.2d at 1549. "For res judicata purposes, different primary rights are at stake where the substance of the two claims differ." *Heller v. Plave,* 743 F.Supp. 1553, 1567 (S.D.Fla.1990) (Scott, J.). In making this determination, courts may also consider whether the acts complained of are the same, whether the demands for relief are the same, whether the theories of recovery are the same, and whether the material facts are the same. *Purter v. Heckler,* 771 F.2d 682, 690 (3rd Cir.1985). *See also S.E.L. Maduro (Florida), Inc. v. M/V Antonio de Gastaneta,* 833 F.2d 1477 (11th Cir.1987) (different rights created by statute authorizing *in rem* and *in personam* actions for maritime lien); *Olmstead v. Amoco Oil Co.,* 725 F.2d 627 (11th Cir.1984) (different rights involved in claims for fraudulent inducement (sale) and fraudulent misrepresentation).

Applying these principles to the instant case, the undersigned finds that different rights are at stake. At issue in the forfeiture and revocation cases was the Wilcoxes' right to the seized assets and the restoration of their mailing permits; in this case, at issue is the Wilcoxes' right to make the representa-

tions they did through their various solicitations. The FTC in this action seeks to prohibit all of the defendants deceptive practices and requests a preliminary injunction and consumer redress. The civil forfeiture actions, by contrast, sought a declaration that only the funds in the seized accounts were procured by fraud and requested forfeiture of those accounts; and, the revocation proceeding addressed only those mailings using the revoked permits.

In sum, the undersigned finds that the prior actions involve different parties, different causes of actions, and different claims for relief. Accordingly, the defendants should not benefit from the preclusive effect of *res judicata* effect in this action.

■■■ Nor does the undersigned find that this action is barred by the doctrine of collateral estoppel. The prerequisites for the application of collateral estoppel are well established:

> (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in an earlier proceeding.

*I.A. Durbin,* 793 F.2d at 1549.

■■■ All of the prior actions here were terminated by consent orders; no issue of law or fact was ever adjudicated. The orders entered by the courts were no more than *pro forma* acceptances of agreements by the parties to settle their controversies. Generally, consent judgments do not have an issue preclusive effect on future litigation unless the parties intended the prior judgment to operate as a final adjudication of an issue. *Kaspar Wire Works, Inc. v. Leco Engineering and Machine, Inc.,* 575 F.2d 530 (5th Cir. 1978). *See also, Citibank,* 904 F.2d at 1504 (consent judgments not given conclusive effect under doctrine of collateral estoppel absent intent of parties); *Balbirer v. Austin,* 790 F.2d 1524, 1528 (11th Cir.1986) (consent

judgment cannot support collateral estoppel unless parties intended preclusive effect). The defendants have failed to produce any evidence showing that the parties intended the courts' consent orders (or the parties' stipulations of settlement) to have a preclusive effect. Nor can such an intent be found in the language of the consent orders or the parties' stipulations.[12]

Neither the doctrine of *res judicata* nor the doctrine of collateral estoppel bar this action. Further, as the FTC so aptly stated:

> [To give preclusive effect to the prior actions here] would thwart all law enforcement efforts to stop scam artists and return monies to victimized consumers. The forfeiture actions brought by the United States purely to declare the ownership of seized assets, or administrative revocations of mail permits, would defeat any FTC Section 5 actions to obtain injunctive and remedial relief for consumers. The immediate loser would be the branch of the government that fails to win the race to the courthouse. The ultimate loser would be the consumer. The only winners would be the Wilcoxes of the world, who will quickly strike settlements in forfeiture or permit revocations cases, avoid prohibitions on current and future misconduct, and continue unabated in their fleecing of innocent and unwary consumers.[13]

Plaintiff's Opposition (DE 118), pp. 11–12.

### 5. Remedies

#### a. Permanent Injunction

■ The FTC requests the Court to permanently enjoin the defendants from any involvement in the development, marketing, or sale of any promotion by direct mail. They also seek to prohibit the defendants from making misrepresentations when they market promotions or sell products or services by means other than direct mail. Under § 13(b) of the FTCA, the Court may issue a permanent injunction to restrain violations of § 5(a), 15 U.S.C. § 53(b). *World Travel Vacation Brokers*, 861 F.2d at 1028 (7th Cir.1988); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1086–87 (9th Cir.1985).

■ The Wilcoxes have repeatedly defied law enforcement efforts to compel them to conduct their direct mail solicitations in a nondeceptive manner. The Postal Service issued five administrative cease and desist orders and obtained a consent agreement and order against the defendants to prevent future misrepresentations, all to no avail (FTC Ex. 4. ¶¶). Even the bank seizures in 1991 and 1992 did not deter the Wilcoxes. Their deceptive practices continued up until the entry of the temporary restraining order in this action. If not enjoined, the defendants will likely continue such practices in the future. Accordingly, the undersigned concludes that this is a proper case for permanent injunctive relief.

#### b. Consumer Redress

■ The FTC further requests that the Court hold the defendants jointly and severally liable for consumer redress. A district court's authority to issue permanent injunctions under § 13(b) permits it to invoke the full range of its equitable powers to fashion appropriate remedies for violations of the FTCA, including consumer redress. *Amy Travel Service*, 875 F.2d at 572 ("[T]he statutory grant [in § 13(b)] of authority to the district court to issue permanent injunctions includes the power to order any ancillary equitable relief necessary to effectuate the exercise of the granted powers.") *See also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102–1103 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1794, 131 L.Ed.2d 722 (1995) (restitution and disgourgement appropriate remedies under § 13(b)); *FTC v. Security Rare Coin & Bullion Corp*, 931 F.2d 1312,

---

**12.** Because the defendants have failed to demonstrate that any issues were actually litigated in the prior actions, the remaining elements for the application of collateral estoppel need not be considered.

**13.** Courts have refused to give preclusive effect to prior actions where protection of the public interest is at stake. *See, e.g., Porter & Dietsch,*

*Inc. v. FTC*, 605 F.2d 294, 300 (7th Cir.1979), *cert. denied*, 445 U.S. 950, 100 S.Ct. 1597, 63 L.Ed.2d 784 (1980) (FTC not precluded from litigating claims by prior Postal Service cases involving similar false advertising and safety claims because of the importance of protecting the public).

1314 (8th Cir.1991) (monetary equivalent of rescission appropriate remedy under § 13(b)); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir.1984) (asset freeze and appointment of receiver appropriate remedies under § 13(b)); *FTC v. American Standard Credit Systems, Inc.*, 874 F.Supp. 1080, 1087 (C.D.Cal.1994) (rescission and restitution proper remedy under § 13(b)); *US Sales Corp.*, 785 F.Supp. at 752–53 (restitution proper consumer redress under § 13(b)).

■■■■ Once corporate liability has been established, individual defendants may also be held liable for consumer redress if the court finds that they participated directly in the deceptive practices or acts or that they possessed the authority to control them. *Amy Travel Service*, 875 F.2d at 573. "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Id.* To impose individual liability, the Court must additionally find that the individual defendants had knowledge of the dishonest or fraudulent conduct. *Id. See also American Standard Credit Systems*, 874 F.Supp. at 1089; *Patriot Alcohol Testers*, 798 F.Supp. at 859. The knowledge requirement can be satisfied by demonstrating "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud with an intentional avoidance of the truth." *Kitco*, 612 F.Supp. at 1292. *See also Amy Travel Service*, 875 F.2d at 574; *American Standard Credit Systems*, 874 F.Supp. at 1089; *Patriot Alcohol Testers*, 798 F.Supp. at 859–60. A defendant's participation in corporate affairs is probative of knowledge. *Kitco*, 612 F.Supp. at 1292 (citing *FTC v. Int'l Diamond Corp*, 1983–2 Trade Cas. (CCH) ¶ 65725 at 69,708, 1983 WL 1911, at 6–7 (N.D.Cal. Nov. 8, 1983)).

The FTC's uncontroverted evidence reveals that Scott and Linda Wilcox owned, controlled, and actively participated in the conduct of Direct Response, Inc., as well as of the various direct mail companies doing business under other names (Answer, ¶ 5–7, 10, 18; Admissions 6–7, 10–13, 82, 91–92).

Scott Wilcox was president of Direct Response, Inc. for six years, until May 1991; his wife, Linda Wilcox, has been president since that time. The Wilcoxes made all the major business decisions, wrote or approved all the solicitations (*See, e.g.*, FTC Ex. 6, 10–17), personally signed some of these solicitations (FTC Ex. 21–22; Ex. 56, 002116, 002126), and decided when to send the mailings (Admissions, 114–15, 136; Tr. 12). They also wrote or approved the pamphlets sent to consumers (FTC Ex. 29–33; Admissions, 120–134; Tr. 27) and selected the companies to supply the items that were shipped to consumers. Linda Wilcox personally decided whether to ship items for which the consumers had paid (Tr. 18–19, 30; S. Wrye Dep. 22). She further decided upon the manner to respond to consumer complaints (Kreiger Dep. 99), to consumer protection organizations, such as the Better Business Bureau (Kreiger Dep. 25), and to consumer letters that threatened legal action (G. Wrye Dep. 27–28). Linda Wilcox also reviewed weekly reports showing the number of unshipped, prepaid orders for each promotion (Tr. 16–17); the reports showed that more than 500,-000 consumers who had paid money had received nothing in return as of November 1992 (Tr. 27–28).

The Wilcoxes also made all major financial decisions, such as where to open bank accounts, whether to deposit cash sent by consumers, and when to withdraw funds from banks. (Tr. 37; Titus Dep. 59; Hare Dep. 37; Pitcock Dep. 63, 132–33). Both signed the corporate checks (Admissions, 8–9).

Nor can it be disputed that the Wilcoxes knew of the deceptive conduct. They certainly learned from notations on consumers' checks and money orders that the consumers expected to receive a specific award, such as a car, television, or specific amount of money (Titus Dep. 13–16), and they knew that consumers would not be receiving what they expected (Tr. 27). Moreover, from the thousands of consumer complaints, the Wilcoxes clearly knew that their solicitations had mislead the consumers. The defendants received up to 300 to 400 calls per day from consumers registering complaints (Berryman Dep. 27, 29–30); most of these complaints

concerned the shipped items or the failure to receive anything in return for their money (Kreiger Dep. 26). Linda Wilcox met weekly with the customer service supervisor to discuss consumer complaints, and she prepared telephone scripts for the employees to use in responding to such complaints (Berryman Dep. 11–13, 20; Taylor Dep. 21–22; Pitcock Dep. 95).

■ There exists no genuine issue of material fact that the Wilcoxes' knew of and directly participated in the company's deceptive conduct. Accordingly, both Scott and Linda Wilcox should be held individually liable for consumer redress.

### c. Amount of Consumer Redress

A certified public accountant has reviewed Direct Response's corporate income tax returns for the years 1990 and 1991 and Scott and Linda Wilcoxes' individual income tax returns for those same years; these returns indicate that the reported income was derived from mail order businesses. The accountant avers that the defendants received $22,446,390 from consumers through their direct mail businesses. After deducting the cost of goods actually forwarded to certain consumers, the accountant concluded that consumer injury totals $22,024,950 (FTC Ex. 74, ¶ 10).

■ Defendants challenge the amount of consumer redress sought by the FTC. They first contend that the FTC may only obtain restitution on behalf of consumers submitting sworn affidavits establishing their individual loss. This argument, however, has been considered and consistently rejected by the courts; the FTC is not required to show reliance and injury by each individual consumer. *See, e.g., Security Rare Coin,* 931 F.2d at 1315–16; *Amy Travel Service,* 875 F.2d at 573; *FTC v. Nat'l Business Consultants, Inc.,* 781 F.Supp. 1136, 1141–42 (E.D.La.1991); *Kitco,* 612 F.Supp. at 1291; *Int'l Diamond,* 1983–2 Trade Cas. at ¶ 69709. Not only would such proof be "virtually im-

possible," *Security Rare Coin,* 931 F.2d at 1316, but such a requirement "would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595, 605 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 373 (1994). Moreover, there arises a presumption of actual reliance where the FTC has demonstrated that "the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product." *Id.* at 605–06. Once this presumption is established, the burden shifts to the defendants to prove an absence of reliance. The FTC here has clearly demonstrated that the defendants made widespread misrepresentations upon which the purchasing consumers relied, and the defendants have presented no evidence to rebut the presumption of actual reliance.

The defendants next argue that the amount sought as consumer redress is excessive because the FTC has not proved that the entire amount of the gross income reflected on the tax returns of Direct Response, Inc. and Scott Wilcox was derived from deceptive solicitations. The FTC, however, has produced an accountant's affidavit attesting that the defendants' tax returns reflect income derived from the direct mail businesses; and the defendants have produced no evidence to the contrary, as they must to defeat summary judgment. The defendants point only to one tax return relating to A.I. Co.[14] (FTC Ex. 74, attached Schedule C), arguing that this return "bears no relationship to Plaintiff's request for damages." (Defendants' Memorandum, DE 116, p. 8). Their own submissions to the Court, however, reflect that consumer checks sent in response to mail solicitations were endorsed on the back as "A.I. Company, doing business as ADCO International, for Deposit Only" (Defendants' Ex. B–2, pp. 9, 12). Adco International is a d/b/a named in the Complaint. Additionally, consumer checks in the amount of $4,248,321 were deposited into

---

**14.** The FTC states that the accountant included in his report only that income reported by Scott Wilcox as being derived from direct mail solicitations; he excluded income reported on other Schedule C's for Telco Directory Publishing

(identified as "mail order publishing") and Adco International Co. (identified as "mail order automotive parts"), which presumably reported income unrelated to the direct mail solicitations at issue here.

**1106**

A.I.'s account (Defendants' Ex. B–2 at 15–16). Scott Wilcox's notarized claim for the A.I. funds seized by the postal authorities states that the A.I. account was used for "all incomes" from the sole proprietorships of direct mail projects. (Defendants Ex. I). Moreover, the defendants withdrew over $100,000 from the Direct Response account and deposited those monies into the A.I. account (Defendants' Ex. B–2 at 13).

 The defendants having produced no credible evidence to rebut the FTC's showing, the undersigned concludes that the income reflected on the defendants' tax returns less the costs of goods actually forwarded to consumers constitute an appropriate measure of consumer injury.

### *RECOMMENDATIONS*

Based on the foregoing, the undersigned RECOMMENDS as follows:

1. That Plaintiff's Motion for Summary Judgment (DE 102) be GRANTED;

2. That Defendants' Motion for Summary Judgment (DE 114) be DENIED;

3. That the Court issue a permanent injunction prohibiting the defendants from any involvement, direct or indirect, in the development, marketing, or sale of any promotion by direct mail and from making misrepresentations when they market promotions or sell products or services other than by direct mail;

4. That the Court enter judgment holding the defendants jointly and severally liable for consumer redress in the amount of $22,024,-950;

5. That the permanent receiver, Gerald Wald, be directed to liquidate any remaining assets of the receivership defendants, take all appropriate steps to maximize the amount of funds available for consumer redress, formulate a plan for the distribution of assets to consumers for Court approval, and administer the distribution of such assets pursuant to further order of the Court.

The parties will have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Wilkie D. Ferguson, Jr., United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the district judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1); *Nettles v. Wainwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 7th day of September 1995.